H. W. WRIGHT LUMBER COMPANY, Respondent, vs. McCORD, Appellant.

*November 15, 1910—February 21, 1911.*

*Estoppel: Married women: Dower: Acquiescence in void divorce and remarriage of husband: Innocent purchasers.*

1. In this state the doctrine of equitable estoppel applies as well to married women as to other persons.

2. One who culpably stands by and allows another to contract on the faith and understanding of a fact which he can contradict, cannot afterwards dispute the fact in an action against the person whom he has thus assisted in deceiving.

3. During many years, and until her husband's death, a wife allowed to go unchallenged his claim that he had procured a divorce, and in silence permitted him to hold out as his lawful wife another woman, whom he had publicly married. She knew that the alleged divorce, if any existed in fact, was invalid, and knew or had good reason to believe that he was engaged in large business transactions and dealing daily with people who in good faith accepted his second marriage as valid; and knew also that it was necessary for the wife to sign conveyances of the husband's real estate, and that such conveyances were probably being signed by the reputed wife and being accepted by the grant-

ees. *Held*, that by such conduct she was estopped, as against the innocent purchasers from the husband, from claiming any dower in lands conveyed by him in his lifetime.

4. Where both husband and wife are residents of this state, any decree of divorce by a court of another state can have no validity.

5. As between two equally innocent parties, equity demands that that one shall suffer whose conduct has placed it in the power of a wrongdoer to deceive the other.

APPEAL from a judgment of the superior court of Lincoln county: ALMON A. HELMS, Judge.   *Affirmed.*

This is an action under sec. 3186, Stats. (1898), to quiet the plaintiff's title to three parcels of land in the city of Merrill on which the plaintiff's manufacturing plant and yards are situated.   The defendant claims dower in the lands as the widow of one Myron H. McCord, deceased.   The material facts appearing on the trial were not in serious dispute and were substantially as follows: Myron H. McCord acquired a tax title to two of the parcels in the year 1878, and a quitclaim title to the remaining parcel in the year 1880. As to two of the parcels the title then acquired is claimed to have been worthless, but under the view which we have taken of the case it is not necessary to decide the question.   He claimed title to all three of the parcels in September, 1881, when he formed a copartnership with Henry W. Wright, deceased, under the firm name of McCord & Wright, and commenced the manufacture of lumber in the mill upon the premises.   In 1882 he obtained another title to the two parcels before mentioned as to which his title was doubtful, and in the same year conveyed an undivided one-half interest to his partner, Wright, in the entire three parcels.   The premises were thereafter used in the partnership business until April 17, 1883, when the partnership was dissolved, Mr. McCord selling out his interest to Mr. Wright, who assumed all debts and took all property, including the lands in question, paying McCord $30,342.23 for his interest in the business and property.   Of this last named amount, $20,000 was secured by mortgage on the lands in question.

It appears by the evidence that when McCord sold out to Wright, the firm property, including the real estate in question, was inventoried at $215,000 and the indebtedness at $145,000, and the land in question was estimated in the inventory to be worth $60,000. Wright conducted the business alone until June 25, 1883, when he made a general assignment for the benefit of his creditors, which included the lands in question. Two of the parcels were afterwards conveyed by the assignee to third persons, and some time later, Mr. Wright having settled up with his creditors, there was formed the present corporation, and the two parcels which had been conveyed to third persons were purchased by the corporation and conveyed to it in 1889. In 1890 said corporation acquired title to the remaining parcel, and has carried on its lumber manufacturing business in the plant upon the three parcels ever since its incorporation. The $20,000 mortgage which Mr. McCord received was paid and satisfied August 25, 1884.

The claim of the defendant for dower arises thus: Myron H. McCord and the defendant were married at Shawano, Wisconsin, April 15, 1861, and resided there until the winter of 1874–75, during which time a number of children were born to them. During the winter last named Myron H. McCord went to the village of Jenny (now Merrill), Wisconsin, and established a newspaper, which he published for about ten years. On going to Jenny he left the appellant and the children at Shawano for a time, but they followed during the following summer and lived with him until some time in 1876, when *Mrs. McCord* with the children went back to Shawano on a visit at McCord's request. While there she received through the mail a newspaper containing a notice or summons in a case entitled *Myron H. McCord v. Anna M. McCord,* purporting to be pending in some court in Utah. Soon thereafter she returned to Jenny with two of the children and met Mr. McCord, who threw a paper in her lap, telling her, "Here's your divorce; I am through with you,"

and requesting her to return to Shawano. She did not read
the paper and does not know what became of the same, but
thought at the time that the divorce was not legal. A few
days after this she took her children and returned to Sha-
wano, and later in the year met Mr. McCord at Oshkosh and
had some negotiation with him, as a result of which he deeded
several pieces of land to her, including a store building in
Shawano, and agreed to pay weekly certain sums for the sup-
port and education of the children. After the meeting at
Oshkosh he returned with her to Shawano for a few days
and promised to return again at Thanksgiving time, but did
not do so. The parties continued to live separate, and on
August 25, 1877, Mr. McCord publicly married Sarah Etta
Space at Jenny and continued to reside there until 1893.
During all of this time Mr. McCord and Miss Space lived
together publicly as man and wife and were popularly sup-
posed to be such. As before stated, Mr. McCord went into
business with Wright in 1881 and the business grew to large
proportions. He engaged in logging and other enterprises
and actively participated in politics, held a number of local
offices, and in 1888 was elected to Congress. He acquired
lands and made many sales and deeds of the same, and in all
these deeds, including the deeds of the lands in controversy,
Miss Space joined in the execution thereof as his wife.
Such deeds were apparently accepted not only by the grantors
of the plaintiff, but also by all other persons who dealt with
Mr. McCord, as perfect deeds and conveyances, upon the un-
derstanding that the marriage to Miss Space was a legal mar-
riage. The defendant learned of the marriage to Miss Space
very soon after it occurred. She never at any time in any
public way questioned the validity of that marriage or as-
sumed that she was still the wife of Mr. McCord. In expla-
nation of her conduct she testified at one time in her exami-
nation that she "didn't know but what his divorce was legal,
and thought, of course, he wasn't a man that would do any-

thing of that kind so openly unless there was something in it," and that she might in this way think that the divorce was legal, but she further testified as follows:

"*Q.* Can you give any reason why you didn't do something to compel him to support you? *A.* I can't give any reason, only that we were getting along there by doing as we had done, and I let matters rest. He never threatened me if I made trouble. I don't suppose he thought I would ever make any trouble. *Q.* Did you keep from making any trouble, or insisting upon any rights you may have had, because you were afraid he would injure you in any way? *A.* It was because he didn't like the thing to be made public; he wished I wouldn't do anything; he might have been arrested, in prison, and didn't want anything like that to happen. Didn't want me to stir up any scandal, or disgrace our children. That is about the only reason I can recollect why I didn't do it."

It further appears that *Mrs. McCord* knew generally that her husband was in business at Merrill and doing considerable business; that she knew that when a man deeded land his wife had to sign the deed, and that she had frequently signed deeds with Mr. McCord during her married life; that the children at times went to Merrill and visited their father. Mr. McCord removed to Arizona in 1893 with his second wife, and they continued to live together as husband and wife until 1903, when his second wife died, and Mr. McCord remarried and lived with his third wife in Arizona until his death, April 27, 1908. In June, 1908, the defendant served notice on the respondent demanding that her dower be admeasured to her, and this action was begun by the plaintiff shortly thereafter.

The trial court held that *Mrs. McCord* by her silence had estopped herself from claiming dower from the lands in question as against the grantors of the plaintiff, who were *bona fide* purchasers for value, and entered a decree quieting the plaintiff's title. From this judgment the defendant appeals.

For the appellant there were briefs by *Thomas J. Mathews*, attorney, and *Brown, Pradt & Genrich*, of counsel, and oral argument by *L. A. Pradt*. On the question of estoppel they cited the following, among other authorities: *Kingman v. Graham*, 51 Wis. 232, 248; *Loizeaux v. Fremder*, 123 Wis. 193, 199; *Hunt v. Reilly*, 24 R. I. 68, 52 Atl. 681; *Rockwell v. Rockwell*, 81 Mich. 493, 46 N. W. 8; *Bartlett v. Kander*, 97 Mo. 356; *Madson v. Madson*, 80 Minn. 501, 71 N. W. 824; *Stevens v. Wooderson*, 38 Ind. App. 617, 78 N. E. 681; *Grober v. Clements*, 71 Ark. 565, 76 S. W. 555; *Norton v. Tufts*, 19 Utah, 470, 57 Pac. 409; *Hilton v. Roylance*, 25 Utah, 129, 69 Pac. 660; *Burgess v. Seligman*, 107 U. S. 20; *Dunn v. Portsmouth Sav. Bank*, 103 Iowa, 538, 72 N. W. 687; *Martin's Heirs v. Martin*, 22 Ala. 86; *De France v. Johnson*, 26 Fed. 891; *Cole v. Cole*, 142 Ill. 19, 38 N. E. 703; *Colton's Estate*, 129 Iowa, 542, 105 N. W. 1008; *Gilman v. Sheets*, 78 Iowa, 499, 43 N. W. 299; *Reel v. Elder*, 62 Pa. St. 308, 1 Am. Rep. 414; *Sammons v. Pike*, 108 Minn. 291, 120 N. W. 540; *Nash v. Baker*, 40 Neb. 294, 296. During the life of the husband the wife's dower right was inchoate merely, and failure to exercise it could not work estoppel. *Beeman v. Kitzman*, 124 Iowa, 86, 99 N. W. 171; *Buzick v. Buzick*, 44 Iowa, 259, 24 Am. Rep. 740. The wife could be barred of her dower only in one of the modes prescribed by our statute. *Wilber v. Wilber*, 52 Wis. 298; *Huntzicker v. Crocker*, 135 Wis. 38; *Harley v. Harley*, 140 Wis. 282; *Farnsworth v. Cole*, 42 Wis. 403; *Motley v. Motley*, 60 Neb. 593, 73 N. W. 738; *Grady v. McCorkle*, 57 Mo. 172, 17 Am. Rep. 676; *Haller v. Hawkins*, 245 Ill. 492, 92 N. E. 299.

*John Van Hecke*, attorney, and *Edward M. Smart*, of counsel, for the respondent, cited, among other authorities, *Nuhn v. Miller*, 5 Wash. 405, 34 Am. St. Rep. 868; *Edgar v. Richardson*, 33 Ohio St. 581; *Davis v. Calvert*, 18 Ky. Law Rep. 975, 38 S. W. 884; *Maher v. Title G. & T. Co.* 95

Ill. App. 365; *Dimond v. Manheim,* 61 Minn. 178, 63 N. W. 495, 497; *Hilbish v. Hattle,* 145 Ind. 59, 44 N. E. 20; *Two Rivers Mfg. Co. v. Day,* 102 Wis. 328; *Holcomb v. Ind. School Dist.* 67 Minn. 321, 69 N. W. 1067; *Rosenthal v. Mayhugh,* 33 Ohio St. 155.

The following opinion was filed December 6, 1910:

WINSLOW, C. J.   It is claimed by respondent that the parcels of land in question were either contributed by Mc-Cord to the capital of the firm of McCord & Wright or were purchased with partnership funds, and in either case became partnership property and not the subject of dower until all of the debts of the firm had been paid.   The further claim is made that two of the parcels at least were necessarily used and absorbed for the purpose of paying such debts, and hence that the defendant can claim no dower in them.

We do not find it necessary to decide these questions.   We shall assume for the purposes of the case that the defendant at one time had an inchoate right of dower in all of the lands in question and that she still retains it unless by her silence she has estopped herself from making the claim.

This court, in common with the majority of courts in this country, has long since abandoned the ancient rule that the doctrine of equitable estoppel has no application to married women.   Our statutes have endowed married women with very full and complete rights, not only as to their separate property, but also as to their liberty of conduct, and have given them practically perfect freedom to deal with property, to contract for their personal services, to conduct their separate business, to bring suits for the enforcement of their rights, and generally to control their own actions without let or hindrance from their husbands.   With these rights necessarily come some added responsibilities.   Privilege and opportunity always bring with them corresponding duties. When a woman's personality was considered to be submerged

in that of her husband, it might well be held that she should be held to be under no responsibility for her acts; but when she stands on a level with her husband and becomes practically master of her own property and destiny, it seems plain that she must logically be charged with the duties and responsibilities which attend every other free and independent personality in its dealings with its peers.     2 Pomeroy, Eq. Jur. (3d ed.) § 814.

The rule is correctly stated by this court in *Godfrey v. Thornton*, 46 Wis. 677 (1 N. W. 362), at page 690, as follows: "Whatever may be the rule concerning the formalities needed to bind married women, there is no doubt they may be estopped by their deliberate conduct as well as any one else." This rule was in effect applied by this court in the cases of *Nelson v. McDonald*, 80 Wis. 605, 50 N. W. 893; *S. D. Seavey Co. v. Campbell*, 115 Wis. 603, 91 N. W. 655; and *Merrell v. Purdy*, 129 Wis. 331, 109 N. W. 82.

One of the most frequent instances of equitable estoppel is the estoppel by silence. Quoting from 2 Herman on Estoppel (§ 937, p. 1062), "He who is silent when conscience requires him to speak, shall be debarred from speaking when conscience requires him to keep silent;" or to express the principle more concretely, "A party who culpably stands by and allows another to contract on the faith and understanding of a fact which he can contradict, cannot afterwards dispute the fact in an action against the person whom he has thus assisted in deceiving." Id. § 943, p. 1069.

The question in this case is, Did *Mrs. McCord* culpably stand by, knowing that she was the lawful wife, and allow people to deal with Mr. McCord and purchase land of him in the innocent belief that Miss Space was his lawful wife? That she stood silently by for years and knowingly allowed McCord to hold out to the world at large that Miss Space was his lawful wife, there can be no doubt. She admits this herself. That she knew he was transacting business with oth-

ers, and business of some considerable proportions, there can be no doubt. She knew by her own admission that a wife was obliged to sign her husband's deeds of land. She had done it many times herself while they were living together, and she admits that she signed the deeds to some lands in Shawano a few years after McCord's second marriage, because the purchaser did not want to take the deeds without her signature. It seems very certain that she must have known that there were undoubtedly other transfers of land likly at any time to be made by her husband to which her signature must be necessary if she was still his lawful wife. She knew also of the public marriage of McCord, of the apparent acceptance by the people of Merrill of its validity, and she must have known that whenever he made a transfer of land, save in the one instance above cited, the second wife was undoubtedly signing the deed as the lawful wife and that such signature was being accepted as such by purchasers. All these conclusions seems to us as necessarily resulting from the evidence. The defendant was distant but a few hours' ride from her husband's residence. If the second marriage was a bigamous marriage to her knowledge, a mere notice in the newspaper or a letter to a friend at Merrill would have apprised the world of the fact and put people dealing with Mr. McCord on their guard. But such a warning never came. She deliberately and consistently held her peace, and the public accepted the situation, supposed that McCord had been divorced and had lawfully remarried, and dealt with him and his apparent wife just as they dealt with other men and women living together in the ordinary manner as husband and wife and reputed to have been legally married.

This state of things had existed some five years when Mr. McCord sold and transferred an undivided half of the premises to Mr. Wright, who was found upon sufficient evidence to be an innocent purchaser. A year or so later McCord, upon the dissolution of the copartnership, deeded

the other half of the premises to Mr. Wright, his second wife joining in both deeds. It appears by the evidence that during the same time McCord had platted a considerable tract of land in Merrill into lots and blocks and sold the same to various purchasers for building purposes, and that in all such cases the deeds had been signed by the second wife and accepted by the purchasers as perfect conveyances. This fact, of course, cuts no figure except in the way of emphasizing the extent and publicity of McCord's business transactions and the importance of the present case.

We cannot resist the conclusion from these facts that it was the defendant's plain duty to speak if she in fact knew or ought reasonably to have known the fact that there was no valid divorce, and this brings us to the most delicate question in the case. There was in fact no valid divorce, and no proof was attempted to be made of even a formal divorce in any court or any state. Whether the newspaper notice to which the defendant testifies and the paper which McCord afterwards threw in her lap really emanated from any court in Utah or elsewhere does not appear. There were certainly no proceedings in Wisconsin, and both parties continuously resided in Wisconsin, so it is clear that no decree of any court in Utah could have any validity. Now it is claimed by the defendant that she believed that the supposed divorce was a valid divorce and hence that she cannot be charged with the duty of proclaiming it invalid. If she believed it valid and her ignorance of its invalidity was not culpable under the circumstances, this conclusion is doubtless correct; but did she believe it to be valid? In the first place, it is worthy of remark that if she was ignorant her ignorance was largely wilful and deliberate. The evidence shows that she paid no attention to the summons in the newspaper; she did not preserve or even examine the paper which McCord gave her and called a divorce; she made no inquiries, asked no questions, took no advice; but on her own statement acquiesced without

a struggle or a word in a decree which separated her forever from the husband of her youth and the father of her children, though confessedly she had been a faithful wife and given her husband no cause for complaint. Apparently she deliberately determined to let her husband go without objection, whatever the nature of the supposed divorce proceedings might be. But it is very certain from the evidence that she thought the divorce invalid from the very start. She herself testifies that she felt the divorce was not legal, that it seemed to her that he had no right to marry any one else, and that her relatives knew that she thought the divorce was not legal. There is also evidence by other parties that she so stated at the time. This is partially explained or modified by other testimony given by her to the effect that she didn't know but what his divorce was legal, and that she thought he wasn't a man who would marry again so openly unless there was something in the divorce. If the testimony ended here it might be difficult to say that a woman unlearned in the law should be held to be charged with knowledge of the invalidity of the supposed divorce, but there is other testimony quoted at length in the statement of facts which seems to us quite conclusive. In this testimony she practically says that the *only* reason why she didn't make him trouble and insist on her rights was because "he didn't like the thing to be made public; he wished I wouldn't do anything; he might be arrested, in prison, and didn't want anything like that to happen; didn't want me to stir up scandal or disgrace our children." No inference is possible from this testimony except the inference that McCord admitted to her that there was no valid divorce and threw himself upon her mercy. In addition to this, the testimony of the daughter of the parties, who was about thirteen years old and living with her mother at the time of the separation, is very significant, as follows:

"I never for a moment thought that my father had a divorce that could be legal. . . . The common understanding

at Shawano was that my father was not divorced; I don't know as my mother knew of that common understanding. She never thought he was herself, probably. I don't know what she thought. I don't know that she ever told us anything about it; we may have simply talked it as a matter of course, and there was very little said."

The same witness was later asked, "Do you know why your mother made no objection to the second marriage?" and replied, "Well, she didn't do it on account of her family principally—not of that temperament. . . . She didn't care to have any more publicity." Again, the same witness said, when asked when she first learned the facts that made her think her father's marriage to Miss Space was not legal, "I knew it *always* as well as I was convinced in my own mind."

This testimony of both mother and daughter bears every impress of truth. Fully convinced of the outrage that had been done to her as a wife and that she could send her husband to prison for it, she yet determined for the sake of her family to bear the burden in silence and make no complaint. It was one of those acts of self-denial which women are frequently doing for the sake of others who are dear to them. If McCord himself, the principal offender, could be made to bear the consequences, and make good to the defendant as far as money can make good, for her sufferings and humiliation, exact justice would be done, but this is impossible. The claim here is against people innocent of wrong themselves, who have dealt with McCord with the honest belief that his marriage to Miss Space was legal. The question is one which is always difficult and sometimes distressing, namely, which of two absolutely innocent parties shall suffer?

It appearing to us clearly that *Mrs. McCord* was convinced from the beginning of the invalidity of the supposed divorce, we think that the well understood principles of estoppel must be held to apply. Knowing that her husband had publicly

married another woman, was proclaiming her as his wife, was transacting business every day with people who supposed the second marriage was legal and valid, she allowed this state of affairs to continue without a word of protest. It seems to us she should then have spoken if she would deal fairly with her fellowmen.

There are authorities which hold that a woman will not estop herself from claiming dower by silence under circumstances somewhat similar to those present here. Among such authorities are *Martin's Heirs v. Martin,* 22 Ala. 86; *Reel v. Elder,* 62 Pa. St. 308; *Cruize v. Billmire,* 69 Iowa, 397, 28 N. W. 657; and *Cazier v. Hinchey,* 143 Mo. 203, 44 S. W. 1052.

The greater weight of recent authority, however, supports the position here taken. *De France v. Johnson,* 26 Fed. 891; *Norton v. Tufts,* 19 Utah, 470, 57 Pac. 409; *Hoig v. Gordon,* 17 Grant Ch. (Up. Can.) 599; *Nuhn v. Miller,* 5 Wash. 405, 31 Pac. 1031, 34 Pac. 152; *Sadler v. Niesz,* 5 Wash. 182, 31 Pac. 630, 1030; *Gilbert v. Reynolds,* 51 Ill. 513; *Brown v. Kerns,* 6 Ohio N. P. 68.

It follows that the judgment below was right and must be affirmed.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied February 21, 1911.