The bill is to recover dower in a property in Union Hill, Hudson county, conveyed by the complainant's late husband, Ernest Muller, to the defendant Thomann, in 1920. The *Page 290 
deed was signed by one Katherine Thomser Muller as wife of Ernest. The defendant, the Trust Company of New Jersey, holds a mortgage on the property given by Thomann to raise the purchase money.
Ernest and the complainant were married in 1896 and lived in Brooklyn ten years, when he abandoned her and their six children, eloping with Katherine, a shop girl in his bakery. The two came to Newark, stayed for nine months, then lived in Jersey City for three years, and from 1910 to 1923 made their home in Union Hill when Ernest discarded Katherine for another. He died in 1926. Ernest and Katherine entered into a ceremonial marriage in Newark unknown to complainant, had three children, lived together as husband and wife, and were generally accepted as bearing that relation. Thomann took title believing Katherine to be Ernest's wife. He had known her by repute as Mrs. Muller. Muller's lawyer, who prepared the title papers and certified Katherine's acknowledgment to Thomann's deed, thought Katherine's assumed status to be genuine; he had seen her for years presiding over Ernest's household. And the trust company's lawyer had Ernest depose that he was Katherine's husband before he parted with his client's money. The complainant all along knew of the meritricious relation and sensed the false impressions created, wherefor the defendants set up that she is now estopped from asserting her right to dower because, as they charge, that Ernest and Katherine "were living together as husband and wife with a knowledge, consent and the acquiescence of the complainant, and that during the said time, including the time of sale, the said complainant knew that the said Ernest Muller and Katherine Muller, his wife, dealt openly and notoriously with the said property in their own right without regard to the claim now made by the said complainant and that the said complainant acquiesced and consented to the sale;" and further that Katherine signed Thomann's deed as wife to Ernest with the knowledge of complainant and with her acquiescence. None of the charges is made out except knowledge of the misalliance and public deception. Consent or acquiescence stands refuted by all the established circumstances. Shortly after the abandonment, *Page 291 
the complainant, with the children, appealed to Ernest twice in Newark to take them in; he refused, but agreed to send her $40 a month for the support of the seven. Her plaintive admonition to him that "we [will] see who feels sorry" indicates her feelings at that time. She and the children met with a like refusal when on a similar mission to him in Jersey City, but he raised the allowance to $50. She went to him once in Union Hill and tried to persuade him to return. Later, while visiting the children in Brooklyn, he asked her whether she would move to Jersey City if he bought her a home, promising to come home once a week; nothing came of that. In his letters he addressed her as "Dear Wife" and signed himself "Your Husband." She permitted the children to visit him, and they did frequently, Sundays. He paid the allowance regularly, but warned her that he would disappear if she made trouble.
The charge that the complainant consented to and acquiesced in palming off Katherine as Ernest's wife in the conveyance to Thomann is based on the recited facts and because she knew that Ernest had prospered while in Union Hill, and that he owned real estate; that she knew a wife had to join in a husband's conveyances and, arguendo, must have realized that in the event of sales Katherine, in all likelihood, would play the substitute. The fact is she did not know he owned any property other than a house in Thorn street, where he and Katherine made their home, and when he sold that, some years before the Thomann transaction, he had her (complainant) execute the deed as wife. This naturally would disarm her of any suspicion that he would impose Katherine as his wife in deeds of conveyance and assured her that, though her marital rights were denied and usurped, her property rights were safe from encroachments. Unknown to her he owned and conveyed two other pieces of property in which Katherine took the part of wife. The complainant knew Ernest ran a bakery in the premises here involved and that he sold the business before going on a trip to Europe with Katherine, resuming it after he returned, but she did not know he owned the premises, and the charge that she knew of the conveyance to Thomann *Page 292 
and that she acquiesced in Katherine signing it was abandoned at the hearing.
The defense is not that of innocent purchaser for value, but the contention is that the complainant has lost her right to one occupying that position, and in pressing the estoppel the defendants take the broad stand that it was the duty of the complainant to assert her rights and thus, somehow, break up the unholy alliance or expose it so that the public would be informed and not misled, and that having failed in this "duty," and the defendant having been deceived by the false appearances, she must now forego her dower. The proposition is not appealing. What was the wife to do? In what respect has she offended against the maxim that "he who is silent when conscience requires him to speak shall be debarred from speaking when conscience requires him to keep silent?" What duty did she owe the public of which she was remiss or to the defendants which she neglected? A divorce? That was a privilege, not a duty; and she was a Roman Catholic and a divorce offended her conscience. Besides she was not called upon to give Ernest his freedom, and him to Katherine. A bill for maintenance would not lie, for she was receiving support. She could have complained to the public prosecutor or to the police authorities, but the nature of the offense did not make it a duty (Comp Stat. p. 1748 § 20; 1761 § 48), and she was not a competent witness against her husband. Comp. Stat.p. 2332 § 5. She was not called upon to spread the scandal by denouncing him to his neighbors or proclaiming it in the market places. Reprobate that he was, and strange as it would seem, she loved him, blaming the other woman, and never gave up hope that some day, somehow, he would return, as he had often promised, and so she kept her silence, protecting him from a deserved punishment and the children and herself from unpleasant notoriety and the humiliation that would follow. And more, his threat to disappear altogether if she caused him trouble facing her on one side and the fact that she had to have food for her little ones on the other dismayed and subdued her and she was resigned. A fair appraisal of her attitude is, that she protestingly submitted to a tragic situation from which she saw no escape. *Page 293 
Silence was the price of self-preservation. It was an involuntary choice. Conduct must be voluntary to work an estoppel. Acquiescence or consent predicates voluntary behavior. The defense pleads these essentials in bar and the history of the case supports neither. The earlier doctrine was that to effect an estoppel the misleading conduct must be willful; implying intent to defraud. It was so held by Lord Denman in Pickard v. Sears,6 Ad. E. 469, and accepted as law in Kuhl v. Jersey City,23 N.J. Eq. 84, and Mutual Life Insurance Co. v. Norris,31 N.J. Eq. 583, but Lord Denman's use of "willfully" in thePickard Case was later interpreted as "voluntarily" inCornish v. Abington, 4 Hurlst. N. 549, and, as modified, adopted in Ruckelschaus v. Oehme, 48 N.J. Eq. 436; affirmed,49 N.J. Eq. 340; Vide, 54 N.J. Eq. 344. The modern view is that a married woman may bar her right of dower by conduct (2 Pom.Eq. Jur. § 514), and it is recognized in this state in Sip
v. Lawback, 17 N.J. Law 442.
There is no guiding authority in this state. Cases from sister states are not inconsistent with the view that to estop a widow of her dower her conduct during coverture must be voluntary. In some, silence and inaction towards a philandering spouse is interpreted as acquiescence. These cases present the common picture of a run-away husband living with a reputed spouse to the knowledge, without protest, of the wife; the reputed spouse joining in conveyances and the purchasers being misled by appearances. In Hoig v. Gordon, 17 Grant's Ch. 599, the wifebargained with her husband to conceal her relation. InDeFrance v. Johnson, 26 Fed. Rep. 891, the wife wasindifferent and allowed the false appearance. In Gilbert v.Reynolds, 51 Ill. 513, the wife left her husband for his misconduct, he obtained a divorce and she was content and abided by it. In Wright Lumber Co. v. McCord, 145 Wis. 93,
there was a divorce, illegally procured, and a substantial settlement on the wife; a public ceremonial marriage generally accepted as genuine in the small town in which the husband and second wife lived and where he was a prominent merchant and land owner engaged in selling land. The wife stood by, content. InKantor v. Cohn, 168 N.Y. Supp. *Page 294 846, the wife obtained a rabbinical divorce and, believing herself free, married, and so did the husband. In Bowman v.Thurman, 14 Ont. Wky. Rep. 254 (n.e.), the wife married
after being abandoned. In Brown v. Kerns, 6 Ohio N.P. 66
(n.e.), the wife abandoned her husband, married and lived with another. In Reel v. Elder, 62 Pa. St. 308, the wife, after she had been abandoned, married or consoled herself with another and although she recovered, the better view would seem to be that she should have been estopped, because she voluntarily refrained from asserting her rights, evidenced by her later misconduct. This decision is criticized in Kantor v. Cohn,supra. And so in Norton v. Tufts, 19 Utah 470, husband and wife obtained a Mormon divorce and each married. The wife, upon discovering that her second marriage was unlawful, sued for divorce and it was held that she was not estopped as against a mortgage given after the suit was begun. Her acquiescence manifested by the divorce and her remarriage should have barred her. In Sadler v. Niesz, 5 Wn. 182 (under statute the wife has a community interest in her husband's property), the husband had deserted the wife; he during separation made a conveyance representing himself to be single and later they became reconciled. The wife and husband sued to recover her community share and she was held to be estopped. The rationale of the opinion being that to put a purchaser on notice of community property cohabitation must exist, one of the judges remarking that "it is the duty of the undivorced husband and wife to live together," and that as failure to live together gave color to the husband's representation and tended to mislead innocent purchasers, the wife could not recover. The judgment below was affirmed; there was not a constitutional majority of judges of the same opinion in the appellate court. In Nuhn v. Miller,5 Wn. 405, also a community interest suit, the parties separated; the husband during the separation sold, representing himself to be unmarried and the purchaser relied on the representation. The court put its decision on the ground that the wife treated the separation as final, permitting her husband to go where and do as he pleased. In all these *Page 295 
cases, except the former of the last two, the element of voluntary conduct is a factor which distinguishes them from the one in hand. In the Sadler and Nuhn Cases, and they were actions by wives, not widows, for community shares, not dower, the purchasers were deceived by the husband's falsehood. It is not, however, the law that a widow may suffer the loss of her dower simply because of a purchaser's confidence in the husband's representation that he is single. Her conduct must contribute to raise an estoppel. Cruize v. Billmire, post, and Smith v.Fuller, 138 Iowa 91.
There are other cases involving claims for dower but they are not against innocent purchasers for value, and while helpful, are distinguishable in that respect. Martin's Heirs andAdministrators v. Martin, 22 Ala. 86, and Dunn v.Portsmouth Savings Bank, 103 Iowa 538, were contests between widows and reputed widows — second wives; the latter case included one who held under the reputed widow. In Hollander v.Abrams, 100 N.J. Eq. 298, our court of errors and appeals held that a wife could not estop herself by fraudulently representing that she was a widow and thereby capacitate herself to convey land without her husband joining. In Cruize v. Billmire,69 Iowa 397, the purchaser was put on notice that the husband had a wife. And so, in Beeman v. Kitzman, 124 Iowa 86; in Syck v.Hellier, 140 Ky. 388, and in Stevens v. Wooderson,38 Ind. App. 617. In Hall v. Marshall, 139 Mich. 123, the controverted question was whether the wife had concealed her marriage when her husband executed a mortgage representing himself to be single, of which representation she had no knowledge. In Cazier v. Hinchey, 143 Mo. 203, estoppel was not raised on the appeal. Hunt v. Reilly, 24 R.I. 68, was on pleadings and involved a forged release of dower and the question was whether the widow was estopped by her silence; a topic unrelated to the principle here involved.
The estoppel, an invention of equity for the promotion of justice, is not inherent in, but springs to the defense of an action; and arises to disarm one from maintaining a right which otherwise he would have were it not for his voluntary conduct which precludes him from asserting it against another *Page 296 
thereby misled to his injury. Here, the complainant was not culpable. She and the defendants are alike innocent victims of Ernest's perfidy; and the equities being equal, the legal estate of the complainant must prevail.