ESTATE OF GIBSON: GIBSON (Ethel), Appellant, v. MADI-
SON BANK & TRUST COMPANY, Administrator, and
others, Respondents.

*May 8—June 2, 1959.*

For the appellant there was a brief by *Kaftan, Kaftan & Kaftan* of Green Bay, and oral argument by *J. Robert Kaftan*.

For the respondent Madison Bank & Trust Company there was a brief by *Lee & Becker* of Madison, and oral argument by *Stuart H. Becker*.

For the respondents Velda Irene Gibson, Ellen Gibson MacQuarrie, and Margaret Irene Gibson there was a brief

by *Snyder & Greco* of Milwaukee, and oral argument by *E. H. Snyder*.

HALLOWS, J. The first question is whether or not the Mexican divorce obtained by the deceased from Velda Irene Gibson was void. The deceased and the respondent Velda were married December 30, 1914, in Wisconsin. Two children, Margaret Irene Gibson and Ellen Gibson MacQuarrie, were born of this marriage. The marriage was unsuccessful and the parties separated intermittently over the years. In 1939 the deceased was living in a hotel in Missouri and wrote his wife Velda in Wisconsin that he was obtaining a Mexican divorce. The papers were personally served on the respondent Velda in August at Menomonie, Wisconsin, where the parties lived for several years. On October 21, 1939, the Mexican court granted a divorce to the deceased. At that time neither the deceased nor Velda Irene Gibson were residents or domiciled in Mexico.

The question of the validity of a decree of divorce is decided in accordance with the law of the domicile of the parties, including the conflict-of-law rules of that state. Restatement, Conflict of Laws, p. 13, sec. 8. The record shows no proof of any domicile other than Wisconsin. A court has no jurisdiction to grant a divorce where neither party has a *bona fide* domicile in the state where the court sits. At least one of the parties to the marriage must be domiciled in the state. Restatement, Conflict of Laws, p. 168, sec. 111, states the rule as follows: "A state cannot exercise through its courts jurisdiction to dissolve a marriage when neither spouse is domiciled within the state." In the comment on this section it is stated that domicile, like any other jurisdictional fact, is subject to collateral attack in any other state by the party who was not per-

sonally before the court when the decree of divorce was granted. The Restatement of Conflict of Laws is in accord with the law of Wisconsin. *St. Sure v. Lindsfelt* (1892), 82 Wis. 346, 52 N. W. 308; *Davis v. Davis* (1951), 259 Wis. 1, 2, 47 N. W. (2d) 338. A divorce granted by a court of a state in which neither party to the marriage has a *bona fide* domicile is void and such divorce decree is not entitled to full faith and credit. *Rice v. Rice* (1949), 336 U. S. 674, 69 Sup. Ct. 751, 93 L. Ed. 957; *Esenwein v. Commonwealth of Pennsylvania* (1945), 325 U. S. 279, 65 Sup. Ct. 1118, 89 L. Ed. 1608; *Williams v. North Carolina* (1945), 325 U. S. 226, 65 Sup. Ct. 1092, 89 L. Ed. 1577. The court in the *Williams Case,* after considerable vacillating over the years, adopted the view that judicial power over the subject matter of a divorce suit rested on domicile. Domicile being a jurisdictional fact, it could be questioned and determined by a court of a sister state, and consequently if the court granting the decree has no jurisdiction, its decree is void and is not entitled to full faith and credit.

Here we are not dealing with full faith and credit but with the recognition of a Mexican divorce. No reasons exist, and certainly not on the grounds of comity, why this state should recognize a Mexican divorce void under the laws of this state when a similar divorce granted by a sister state is not entitled to full faith and credit. The uniformity sought by the full-faith-and-credit clause of the constitution requires that a void divorce may be collaterally attacked in any state, and such attack is not confined to the state or states in which the parties to such divorce had their domicile at the time of the granting of the void divorce. It is immaterial whether the deceased had a residence or was domiciled in Missouri; at most, he was not domiciled in Mexico.

The second question is whether Velda Irene Gibson is guilty of laches or is estopped from asserting in this proceeding the invalidity of the Mexican divorce. If the deceased during his lifetime had attempted to assert the invalidity of the decree he would have been estopped on the grounds that he had obtained the divorce and had remarried. Restatement, Conflict of Laws, p. 169, sec. 112. See Anno. 109 A. L. R. 1018.

For the appellant, who married the deceased in Mexico on the same day or a day or two after the divorce from the respondent Velda Irene Gibson was granted to the deceased, to raise the question of laches is an entirely different problem. The appellant did not rely on anything the respondent Velda did. She relied in her hasty marriage upon herself and upon the deceased. The appellant did not change her position in reliance on any act of Velda, who did not know the decree had been entered for some seven months.

It is argued that somewhere during the sixteen years prior to the death of the deceased that the respondent Velda should have done something about the appellant's situation. Velda did not want a divorce and refused to enter into any stipulation concerning one. About the time she was served with the divorce papers she talked to an attorney friend of her husband for the purpose of stopping it. This attorney advised her the Mexican divorce would be void, but her husband, who was also a lawyer, denied this in lengthy letters to her and gave reasons why the Mexican divorce would be valid. Velda testified she thought the divorce was valid after first thinking it was void. She did not take any action thereto or communicate with the appellant Ethel Gibson.

There is authority for precluding a person from questioning the validity of a divorce decree, although his conduct has not led to the obtaining of the decree, if other reasons

make it inequitable to permit such person to deny the validity of the decree. No opinion is expressed in Restatement, Conflict of Laws, on this proposition. See id., Caveat, p. 170, sec. 112. This court held in *H. W. Wright Lumber Co. v. McCord* (1911), 145 Wis. 93, 128 N. W. 873, that a wife knowing the facts of the divorce which her husband obtained against her in Utah and did not deny the validity of the divorce or make any objection to his later remarriage, was estopped to claim dower in his land as against an innocent purchaser. Ethel Irene Gibson is not an innocent purchaser, even though she worked part of the time she lived with the deceased and thereby contributed, to some extent, to the accumulation of the property which she and the deceased held in joint tenancy. We find no inequitable circumstance in allowing the respondent Velda to raise the invalidity of the divorce under the circumstances of this case.

Neither is the equitable principle applicable that if one maintains silence when in conscience he ought to speak, equity will debar him from speaking when in conscience he ought to remain silent. The respondent Velda owed no duty to the appellant, who took no precautions of her own to investigate the validity of the divorce. The appellant's predicament is of her own doing.

Acquiescence by silence by one who did not participate in securing the void divorce and who had grounds for believing such divorce was valid, which validity was likewise assumed by a third party marrying on the strength thereof and not relying on the acquiescence by silence, ought not to debar or estop the silent one from raising the question of the invalidity of the decree against such third party. Acquiescence by silence presumes a knowledge of the true state of facts and a willingness to accept the actuality of the apparent though false state of facts. The rule has been stated in 19 Am. Jur., Estoppel, p. 663, sec. 55, as follows:

". . . to give rise to an estoppel by silence or inaction, there must be a right and an opportunity to speak and, in addition, an obligation or duty to do so.

"The mere fact that another may act to his prejudice if the true state of things is not disclosed does not render silence culpable or make it operate as an estoppel against one who owes no duty of active diligence to protect the other party from injury."

The trial court was correct in concluding the $700, one half of the proceeds of the collision policy, and the $500, payment for reimbursement of the deceased's medical bills, constituted part of the estate. Title to the damaged car was in the name of both the deceased and Ethel but the insurance policy was in the name of the deceased. In the dispute between the administrator and Ethel concerning who should receive the collision payments under the policy, both agreed with the insurance company that the amount of recovery should be $1,400 and in settlement of their respective claims each should receive one half. Accordingly, each received separate checks for the sum of $700. We find no basis for Ethel's claim of the $700 listed in the inventory as an asset of the estate. She is bound by her settlement agreement.

The medical pay was reimbursement for hospital and doctor bills. The ownership of the car or the named insured is not determinative of who is entitled to be reimbursed. It is paid to the injured party who incurred the medical expense, and in this case belongs to the estate. At the time of the settlement Ethel and her then counsel made no claim to these proceeds and on the evidence we can see no basis for making such claim. The claim made in the trial court has apparently been abandoned on appeal by the appellant.

This leaves the last question of the ownership of the 30 head of Black Angus cattle. On March 1, 1952, the deceased and Ethel were the owners of two promissory notes

secured by chattel mortgages on the cattle and other property. One was in the sum of $7,811.94 and the other note in the sum of $11,750. At the same time they owned a promissory note secured by a mortgage on real estate in Marinette county. Foreclosure actions were commenced by the deceased and Ethel and were consolidated for trial. The chattel mortgage included the said 30 head of Angus cattle. During the pendency of the actions the receiver, under court order based upon a stipulation of the parties, sold the cattle at public auction. There is testimony that Roy Gibson, a cousin of the deceased, bid in the cattle for the deceased and Ethel Gibson. No cash apparently was paid for the cattle; at least, the record does not show it or a bill of sale.

Through inadvertence no findings of fact or conclusions of law or judgment were entered in the action to foreclose the chattel mortgages but were in the foreclosure action of the real estate. On May 27, 1957, while the administration of the estate was pending in the county court, and upon notice to the administrator, the circuit court for Marinette county amended the findings of fact and conclusions of law and the judgment *nunc pro tunc* in said foreclosure actions and found that the deceased and Ethel as joint tenants purchased the 30 head of cattle and took title thereto, and that the net proceeds of the sale of the remainder of the said properties belonged to and were the property of the deceased and Ethel, husband and wife, with right of survivorship. In the conclusions of law the court stated the title to the chattel-mortgage property shall be and is vested in the deceased and Ethel Irene Gibson, husband and wife, and in the purchasers thereof at the sale. The judgment was amended accordingly.

The cattle were transported and placed on a farm in Sauk City under an arrangement with one William Tank. The administrator inventoried the cattle as assets of the estate

and they were sold pursuant to the order of the lower court for $3,937.50. There is some testimony to the effect that the cousin of the deceased had no express instructions from Ethel to bid in the cattle on the foreclosure sale for her, but he thought he was bidding for both the deceased and Ethel.

The evidence also shows that the cattle were registered on the books of the Aberdeen Angus Association in the name of the deceased and that Ethel did not object to the sale of the cattle by the administrator pursuant to the order of the county court. To give this registration the conclusive effect of ownership of the cattle we would have to assume that the deceased, in purchasing the cattle at the foreclosure sale, wilfully and intentionally converted to his use Ethel's interest in the proceeds. We should not presume that the deceased would convert his wife's property (or one who stood in that relationship) on such evidence. In effect the judgment was used to bid in the property at the foreclosure sale.

The findings and judgment of the circuit court for Marinette county are objected to by the administrator on the grounds that that court could not amend its judgment *nunc pro tunc* while the administration of the estate was pending in the county court below. The circuit court has power even after the term to correct its judgment or to add omitted portions thereto to conform the judgment to that actually pronounced. A court cannot modify or amend its judgment to make it conform to what the court ought to have or intended to adjudge. But that is not the case here. What the circuit court did was to amend a judgment *nunc pro tunc* that was to cover three consolidated cases but only covered the subject matter of one. The judgment affected the two cases in which no findings or judgment had been entered. *Fischbeck v. Mielenz* (1916), 162 Wis. 12, 154 N. W. 701; *State ex rel. Hall v. Cowie* (1951), 259 Wis. 123, 47 N. W. (2d) 309; 6 Callaghan's, Bryant, Wisconsin Pleading and

Practice (3d ed.), pp. 54–56, secs. 40.48, 40.49. Likewise, this is not a situation of a court assuming jurisdiction and adjudging a matter which is pending before another court which has concurrent jurisdiction.

We conclude upon a study of the testimony and the exhibits, including the files of the three cases in the circuit court for Marinette county, that the trial court was in error in adjudging the cattle were an asset of the estate of the deceased.

*By the Court.*—That part of the judgment providing that the 30 head of Black Angus cattle were an asset of the estate is reversed. The rest of the judgment is affirmed.

MARTIN, C. J., took no part.