NEAS and wife, Appellants, v. SIEMENS and others, Respondents.*

*March 7—April 5, 1960.*

* Motion for rehearing denied, with $25 costs, on June 7, 1960.

50

For the appellants there were briefs by *Hale, Skemp, Hanson, Schnurrer & Sheehan* of La Crosse, and oral argument by *T. H. Skemp* and *R. G. Schnurrer*.

For the respondents there was a brief by *Donovan, Gleiss, Goodman, Breitenfield & Gleiss* of Tomah, and oral argument by *Victor H. Breitenfield*.

MARTIN, C. J. Plaintiffs had acquired the farm in question in 1913. They lived there and operated the farm for thirty-six years; they moved from the farm in 1949 and thereafter rented it for six years. The renter moved in March of 1955, and plaintiffs again operated the farm until they sold it in August, 1955. About June of that year, Neas listed the farm for sale with Robert W. Lawton, a member of the United Farm Agency, who advertised the farm for sale in the agency's "Fall Catalog." The advertisement read, in part:

"Modern Grade A Dairy. No. 377. 100 acres $25,000. Buildings insured for more than total selling price—comes complete with 20 cows, all equipment in Grade A milkhouse, miscellaneous farm machinery, all feed on hand! 100 acres, 60 tillable, . . ."

Defendant Siemens and his family came to the United States from Germany in 1954. He worked on a farm in Missouri for a time and then decided to buy a farm in northern Michigan or Wisconsin. The son, Bernhard Alfred, obtained a copy of the United Farm Agency catalog in which they found the advertisement referred to. On July 27, 1955, Mr. Siemens, his son, and a daughter Helen called on Lawton at Sparta and went out to see the Neas farm. They decided to purchase it and signed an agreement of sale on July 28, 1955. The agreement called for a down payment of $4,000 on its execution, which the defendants paid, and an additional amount of $2,500 on delivery of a land contract.

The Siemens family moved to the farm early in August and on August 4, 1955, they paid plaintiffs the additional $2,500.

On December 27, 1955, the parties signed the land contract which is the subject of the foreclosure action. The contract provided for a total consideration of $25,000, $6,500 down payment, the balance of $18,500 at four and one-half per cent interest to be paid by assignment to plaintiffs of 40 per cent of the gross proceeds from the sale of milk and milk products. The land contract recited that it was further secured by a chattel mortgage on the personal property which was included in the total purchase price. The $25,000 was allocated as follows: Real estate, buildings, and milkhouse equipment and fixtures, $18,000; personal property, $7,000. When the land contract was signed, the chattel mortgage was not ready for signature and it was never fully executed.

The land contract provided that plaintiffs should keep the buildings insured during the life of the contract and that defendants should pay the premium therefor.

Two grounds for foreclosure were alleged in plaintiffs' complaint: Failure of the defendants to pay the fire and windstorm insurance after August 3, 1955; and failure of the defendants to sign the chattel mortgage provided for in the contract.

As pointed out above, the land contract required the plaintiffs to obtain the insurance, and the evidence shows that Neas renewed the policy on the expiration date or the day before. The trial court properly found there was no breach of the land contract by the defendants in that respect.

As to the chattel mortgage, the trial court found that the defendants' refusal to execute the same was based upon the "failure of the plaintiffs to carry out and fulfil the representations made to the defendants which induced them to enter into said land contract." The evidence shows that some of the machinery included in the personal property sold was not delivered to the defendants until long after the land contract was entered into. The tractor was delivered in September, 1955, the wagon in October, 1955, the drag in April, 1956, the corn planter in May, 1956, the mower on June 28, 1956, and the hay loader May 8, 1957.

The trial court concluded that the plaintiffs' complaint should be dismissed, saying:

"In arriving at that conclusion the court is impressed with the applicability of the oft-quoted maxim that he who comes into court must come with clean hands. The jury's findings that the plaintiffs were guilty of fraud is of great significance. Furthermore, the plaintiffs were aware from the very beginning of the failure of the defendants to comply with the full terms of the contract nevertheless they continued to accept payment under the contract. Under such circumstances and the full circumstances of this case he has waived his right to forfeit the contract."

In their counterclaim defendants alleged fraudulent representations as to the number of tillable acres, the condition of the cows and the machinery, and the amount of insurance on the farm buildings. The jury found fraud in all such respects except as to the farm machinery, and the trial court found that the plaintiffs were guilty of actionable fraud in the several respects found by the jury.

The rule is that the party alleging fraud has the burden to establish proof thereof by clear and satisfactory evidence. *Estate of Hatten* (1940), 233 Wis. 199, 208, 288 N. W. 278, and cases there cited.

The record shows that the elder Mr. Siemens, having been in this country for about a year prior to July, 1955, could not speak English. The son, Bernhard Alfred, testified that he knew a few English words but was not familiar with English words relating to farms, farm property, and farm machinery; that his sister could speak English "a little bit better" than he could.

On July 28, 1955, shortly after Lawton brought the defendants to the farm, Otto Neas arrived and they made an inspection of the farm. Neas testified he spoke very little German to the defendants; that their discussions were principally through the daughter as interpreter. Lawton testified generally to the same effect and stated that the daughter had some difficulty in understanding English farming terms. Bernhard Siemens testified Neas spoke very good German and used that language every time they talked together.

As a background for its consideration of the issues of fraud, the jury could reasonably infer from the evidence that the parties were not dealing on equal terms and that Neas had an advantage in the discussions, an advantage which the jury found he had the inclination to exploit.

In *Miranovitz v. Gee* (1916), 163 Wis. 246, 256, 157 N. W. 790, this court said:

"It is not necessary that the representations made be of such a character as to influence the conduct of a person of ordinary intelligence and prudence. 'There is no such issue in an action for deceit. The sole question is whether the representations in fact deceived the party involved and materially affected his conduct. Effectiveness of deceit is to be tested by its actual influence on the person deceived, not by its probable weight with another.' [Citing cases.]"

Neas testified that on July 28th the defendants made a thorough inspection of the farm. Siemens, however, testified that Neas took him out in his car and their inspection of the land amounted only to driving up the road on the east and on the west of the farm, but that Neas told him in German that there were 60 tillable acres and he relied upon the representation so made. The testimony was in conflict as to the tillable acreage. The man from whom Neas had purchased the farm testified that "people figured" there were approximately 60 acres of tillable land on the farm. Another witness who had owned a farm in the vicinity before 1941 testified his estimate of the tillable acreage on the Neas farm was 60 to 62 acres. William Dwyer, a farmer and representative of the Sparta Produce Credit Association, testified his organization loaned money in connection with farms and in that connection appraisals of farm property were made. He testified the Neas farm was rolling land containing three gullies or valleys. In his opinion it contained about 40 tillable acres. Siemens testified the farm had 43 such acres.

Plaintiffs complain that the trial court admitted evidence as to the meaning of the term "tillable acres," implying that the introduction of testimony on that point led to confusion. The record shows, however, that plaintiffs' counsel stated during the course of the questioning: "There

is only one question, what does a farmer in the town of Adrian call tillable land?" Answering that question, Edmund Neas, plaintiffs' son, testified that tillable land is land that can be worked with a tractor. The same definition was given by the witness, Dwyer, and by the Siemens' son, Bernhard Alfred.

Plaintiffs argue that the most important factor on the issue of the sale of the land is the question of intent; that there has been no showing of fraudulent intent, but on the contrary Neas believed his representation of 60 tillable acres was a true statement. The rule is that in a tort action based upon false representations in the sale of property it is unnecessary to show that the representations were made with fraudulent intent. See *First Nat. Bank v. Hackett* (1914), 159 Wis. 113, 149 N. W. 703. Likewise, there is no merit to the argument that Siemens should have done "something more" than he did to ascertain the number of tillable acres. In *Ohrmundt v. Spiegelhoff* (1921), 175 Wis. 214, 219, 184 N. W. 692, this court said, in discussing the trial court's instructions to the jury:

" 'If false representations were made as to the value of the property and its quality as to productiveness, the plaintiff cannot recover damages for such misrepresentation, if in the exercise of ordinary care and prudence he ought not under the circumstances to have relied upon the representations.'

"It will thus be seen that the court imposed upon plaintiff the duty to exercise ordinary diligence to inform himself of the facts, but that, having exercised such diligence, he might recover though he was more credulous than the ordinarily careful and prudent man. The question in cases where material false representations have been established is, Was plaintiff actually misled by them? and not would an ordinarily careful and prudent man be misled by them. *Krause v. Busacker,* 105 Wis. 350, 81 N. W. 406; *Kaiser v. Nummerdor,* 120 Wis. 234, 97 N. W. 932.

"The defendant excepted to this instruction:

" 'If you find that the representations or any of them were made, that they were false, relied upon by the plaintiff and caused his injury, it is immaterial whether the person making the same in good faith believed them to be true; that of itself would not defeat plaintiff's right to recover.'

"The correctness of the instruction is established by a long line of cases in our court . . ."

In *Westra v. Roberts* (1914), 156 Wis. 230, 145 N. W. 773, the buyer, a native of Holland, dealing with the seller through an interpreter, spent several hours examining the farm and was told that it contained 80 acres of arable land, whereas there were only 66. The jury found that the buyer by the exercise of ordinary observation could not ascertain the number of acres of arable land and this court sustained the finding. It was there said (p. 233):

"The representations made clearly related to facts which materially affected the value of the farm. And the unequivocal statement as to the number of acres under plow was well calculated to set at rest plaintiff's desire to ascertain that fact. When false representations as to material facts are made under such circumstances that the purchaser is justified in relying thereon, and he does so and sustains damage, the cause of action is complete."

Plaintiffs attempt to distinguish the *Westra Case* on the ground that there the land was irregular in character, making ascertainment of the number of tillable acres impossible by ordinary observation. From the evidence before it in this case as to the nature of the land, the jury could likewise conclude that an accurate estimate could not be made at the time the defendants viewed the farm.

After the trial plaintiffs requested that the lands be measured and the request was refused by the trial court. Denial of the motion was within the discretion of the court.

Plaintiffs knew before the trial was completed that the defendants alleged fraud in the representation as to tillable acreage and they should have secured the desired evidence for presentation on the trial. It is stated in plaintiffs' brief:

". . . because of the unusual determination of the jury on the questions of fraudulent representation as to 60 acres of tillable land, counsel for the plaintiffs moved the court, with supporting affidavits, for the opportunity to 'classify, survey, and measure the lands and determine the number of tillable acres thereon . . .' "

We do not consider the jury's finding an "unusual determination" of this issue. The evidence supporting the finding that Neas falsely represented the tillable acreage is clear and satisfactory. Though disputed, it was worthy of belief and the finding must stand.

It is conceded by plaintiffs that Otto Neas represented to the defendants "that the 20 cows included in the sale were good milk cows," and they make no complaint that this question in the special verdict was answered "Yes" by the court.

Dwyer testified that a good cow is one which produces about 40 pounds of milk per day. Donald Lobe, a dairy farmer at Tomah, testified a good Holstein cow would produce about 30 pounds of milk per day; that one producing only 15 pounds was a very poor cow; that a good cow should freshen regularly once a year; that "it would take a very good Holstein cow at that time [July, 1955] to bring $225," and one producing only 15 pounds of milk would have been worth $100 less. Nathan Schlimovitz, a witness for the plaintiffs, testified that a good cow produces between 40 and 50 pounds of milk. Otto Neas testified good milk cows produce 30 pounds of milk, more if they are fresh.

During their visit to the farm on July 28, 1955, defendants saw the cows in the pasture. They were not handled by Siemens prior to the signing of the purchase agreement when he made the $4,000 down payment. There were 18 cows on the farm on July 28th, but Siemens said he did not understand whether those 18 were going to be part of the 20 or not; he testified they were not 18 "good cows." When the Siemens family moved onto the farm early in August there were 18 cows on the farm, but in the meantime Neas had had them tested for Bang's disease and six reactors were found. The reactors were trucked away and Siemens went with Neas to Schlimovitz, a cattle dealer, for the purpose of purchasing eight cows. This occurred after Siemens had made his entire down payment of $6,500. Of the eight cows chosen, Siemens testified he selected only two and the other six, chosen by Neas, were no good. Siemens testified that the cows which Neas sold him produced only 15 pounds of milk per day; that he complained about this to Neas on August 9, 1955, and Neas said the renter had ruined the cows by not having them bred back, and that the milk production was too low. Bernhard Alfred testified he spoke with Neas about the cows at Easter time in 1956 and Neas again complained about the renter and said the cows had been milking from ten to fourteen months without being bred back.

It is conceded Neas promised Siemens 20 good milk cows. The evidence as to the milk production clearly shows that they were in fact poor cows. Plaintiffs argue that the representation they were "good milk cows" was only an opinion, and since Siemens had seen the cows before signing the purchase agreement, facts as to their milk production, etc., were irrelevant and immaterial. They cite 37 C. J. S., Fraud, p. 253, sec. 18:

"Representations are . . . immaterial . . . if they were mere expressions of opinion on which the hearer had no right to rely."

And in *Miranovitz v. Gee, supra* (p. 255):

"Where the person to whom they are made may rely upon them they are held to be statements of fact; where the person to whom they are made may not rely upon them, without being guilty of a want of ordinary care and prudence, they are denominated opinions."

There is no showing in this case that Siemens was guilty of a want of ordinary care and prudence. As pointed out above, he was at a disadvantage from the important standpoint of language. He testified he did not understand that the 18 cows he saw in the pasture on July 28th were to be included in the 20 Neas was to supply. It is a reasonable inference to draw from his testimony that he did not so understand, since he stated he did not consider them good cows and that Neas told him 20 good milk cows would be included in the sale. No actual milking was done by Siemens or in his presence on July 28th and it was not until after he took over operation of the farm in August that he found the cows produced only 15 pounds of milk per day.

In any event, if there were any doubt whether the representation was a statement of fact or opinion, the question would be for the jury. *Graff v. Tinkham* (1930), 202 Wis. 141, 231 N. W. 593.

Plaintiffs argue that it was in plaintiffs' interests that the cows should be good milk cows because they depended on 40 per cent of the proceeds of the milk produced by them for payment of the $18,500 balance due on the purchase price. We see no particular significance in this. If the cows were not good milk producers and defendants could not maintain themselves out of 60 per cent of the

milk check and the farm went back to the plaintiffs, Neas would still profit to the extent of the down payment plus whatever additional payment had been made.

As to the amount of insurance on the farm buildings, plaintiffs admit they represented it was more than the selling price of $25,000 and that the representation was false. In fact, the insurance on buildings alone was $14,500. Plaintiffs argue that the representation was not one upon which the defendants had a right to rely and it did not relate to a matter material to the transaction.

Siemens testified Neas told him there was fire insurance of $26,000 on the buildings and he believed it. The son testified that Neas said he would be willing to sell the farm for $18,000 without the personal property; that defendants tried to get him to reduce the price to $15,000 but he would not do so; and they finally agreed to $18,000 for the farm because "the insurance was even higher than the total price of the farm, which gave me, as well as my sister and father, an imagination of the value of this farm."

The representation was of an existing fact and it was false. It gave the defendants the impression that the insurance company placed a value on the buildings alone which was more than the asking price. Even if it were considered a matter of opinion, Siemens was entitled to rely on the representation. He had no familiarity with farm values in Wisconsin. As stated in *International Milling Co. v. Priem* (1923), 179 Wis. 622, 192 N. W. 68, reliance on statements as to value may be justified by lack of knowledge on the one side and the assumption of knowledge on the other.

The evidence which supports the jury's verdict is not merely credible. We hold that there is ample evidence of such clear and satisfactory character as fully meets the requirements to uphold findings of fraud.

The special verdict contained a question as to the fair market value of the farm, real estate only, on July 28, 1955, and the jury's answer was $13,750. The evidence showed the price of the farm, without personalty, was $18,000 and the trial court entered judgment for the defendants for the difference plus the $1,000 found by the jury to be the difference in the fair market value of the cows on July 28, 1955, and what they would have been worth had they been as represented. Plaintiffs contend that the trial court erred in applying the wrong measure of damages and in granting a money judgment.

As to the measure of damages, we may say that plaintiffs made no objection to the form of the verdict and cannot now complain. *Kanzenbach v. S. C. Johnson & Son, Inc.* (1956), 273 Wis. 621, 79 N. W. (2d) 249. Moreover, they made no motion for a new trial based on such alleged error. See *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 80 N. W. (2d) 380. Plaintiffs contend that under the "benefit-of-bargain" rule an additional question should have been submitted as to what the value of the property would have been if it had been as represented. In discussing the rule in *Anderson v. Tri-State Home Improvement Co.* (1955), 268 Wis. 455, 464a, 67 N. W. (2d) 853, 68 N. W. (2d) 705, this court said:

"However, even under the 'benefit-of-bargain' rule of damages, the price paid by the purchaser is relevant evidence on the issue of the value of the property if it had been as represented. 37 C. J. S., Fraud, p. 478, sec. 143b (2), and 4 Sutherland, Damages (4th ed.), p. 4410, sec. 1172."

No case is cited in support of the contention that the court erred in granting a money judgment. In *Fritsch v. Kornely* (1927), 193 Wis. 54, 55, 213 N. W. 644, this court held than an action to recover damages for fraud is an action

"for the recovery of money only," and thus the judgment was proper.

Plaintiffs argue that defendants, by entering into the land contract on December 27, 1955, more than four months after going into possession of the farm, waived the fraud. Siemens testified that at the time of the execution of the land contract he complained about the cows but Lawton said Neas would provide them by March 1, 1956, and Siemens, relying thereon, signed the contract.

In *Morse Chain Co. v. T. W. Meiklejohn, Inc.* (1941), 237 Wis. 383, 388, 296 N. W. 106, it was held:

"One induced by fraud to enter into a contract may take any one of three courses: (1) Rescind, restore the pre-existing status, and sue at law to recover his payments; (2) offer to restore the status, keep his offer good, sue in equity to rescind and recover his payments; (3) affirm the contract and sue for the damages resulting from the fraud. [Citing cases.]"

The last-mentioned course is the one taken by the defendants. They had already paid $6,500 on the contract before they discovered the fraud and they were probably not in a position, as a practical matter, to pursue any other course. In summarizing the pertinent decisions in 13 A. L. R. (2d), Fraud, Waiver by Acts under Contract, p. 812, sec. 2, it is said:

". . . the decisions are very strongly to the effect that there is no waiver by the mere going on with the contract if, when the fraud was discovered, a stopping or abandonment of performance was not reasonably practicable, or, to express a similar idea, if the defrauded party was then in a situation from which he was unable to recede without prejudice."

In *Sell v. Mississippi River Logging Co.* (1894), 88 Wis. 581, 587, 60 N. W. 1065, involving a false representation as to the number of logs which plaintiff contracted to drive

for the defendant, it was held that plaintiff's completion of the drive "when abandonment of the contract was impracticable" did not constitute a waiver of his right to damages by reason of the fraud.

Plaintiffs also argue that Siemens made no complaint to them of any claimed fraud until this action was commenced. It appears otherwise in the record, but in any event in an action for damages based on fraud the injured party is not required to prove as a condition precedent to recovery that prior notice was given of intention to hold the other party liable therefor. *Schaefer v. Weber* (1953), 265 Wis. 160, 60 N. W. (2d) 696.

It is contended by plaintiffs that the trial court erred in ruling that the defendants were entitled to a jury trial as a matter of right and that the jury findings were not advisory. The argument is without merit. The demand of defendants' counterclaim based on fraud is for the recovery of money only, and defendants were entitled to a jury trial under sec. 270.07, Stats. See *Fritsch v. Kornely, supra.*

*By the Court.*—Judgment affirmed.