MORTGAGE ASSOCIATES, INC., Respondent, v. MONONA SHORES, INC., and others, Appellants: WELCH and others, Defendants.

*No. 47. Argued April 27, 1970.—Decided June 2, 1970.*
(Also reported in 177 N. W. 2d 340.)

[22] Sec. 269.45, Stats.
[23] *See Rice v. Gruetzmacher* (1965), 27 Wis. 2d 46, 133 N. W. 2d 401.

For the appellant Monona Shores, Inc., there was a brief and oral argument by *Jerome L. Rinzel* of Milwaukee.

For the appellants Harold's Painting & Decorating Company, National Bank of North Chicago, and Grimm Masonry, there was a brief and oral argument by *A. E. Simonson* of Madison.

For the appellants Fish Building Supply, Inc., and Alex Temkin, d/b/a Temko Steel Supply Company, there was a brief by *Ross, Stevens, Pick & Spohn,* attorneys, and *Daniel W. Hildebrand* of counsel, all of Madison, and oral argument by *Mr. Hildebrand.*

For the appellant W. O. Zimmerman, Inc., there was a brief by *McBurney & McBurney* and *Carlyle H. Whipple,* all of Madison, and oral argument by *Mr. Whipple.*

For the respondent there was a brief by *Peregrine, Schimenz, Marcuvitz & Cameron* and *M. J. Levin,* all of Milwaukee, and oral argument by *Mr. Alan Marcuvitz* and *Mr. Levin.*

HALLOWS, C. J. The defendant-mortgagor Monona Shores, Inc. (Monona) acquired the land from its sole stockholder Russell J. Lesperance who also, through other corporations, engaged in construction of the apartment complex. Lesperance personally had an option on the land for $188,000 and assigned the option to another corporation of his and finally to Monona at what would appear to be a handsome profit. Unexplained in the record is why a short-term mortgage to facilitate the purchase of the land was recorded in favor of the Bank of Commerce dated June 7, 1965, for $730,000. To pay for the land and the cost of constructing the project,

Monona needed funds because it had little or no capital. The projected cost of the development as determined and represented by Monona was $3,500,000. An arrangement for long-term financing with the Equitable Life Assurance Society of the United States (Equitable) was made for a mortgage loan of this amount. This commitment ultimately provided that $3,000,000 would be paid in three installments as certain units were completed and the remaining $500,000 would be disbursed when a certain percentage of the apartments were leased. To assure the availability of $500,000 if the rentals did not qualify under the Equitable commitment, AIC Financial Corporation (AIC) agreed to make a subordinate mortgage loan of $500,000 with a proviso like Equitable's that a fee was to be paid periodically to keep the commitment in effect. Based upon these commitments, Republic Realty Mortgage Corporation (Republic), which had secured the Equitable commitment as agent, agreed to make the interim-construction loan, which would be paid and replaced by the Equitable mortgage, or as the briefs say, "purchased in three phases." On July 13, 1965, Monona executed and delivered to Republic a note for $3,500,000 secured by the mortgage on the property, which is the subject of this foreclosure action.

Monona, however, did not use Republic but entered into an agreement with Associates for a construction loan of $3,500,000. This transaction was implemented by having Republic assign to Associates the July 13, 1965, note and mortgage and by making a financing agreement with United States Steel Homes Credit Corporation (Steel), a credit corporation, to loan the money to Associates. To secure this loan Associates, as security, pledged the note and mortgage it received from Republic and assigned the instruments to Steel and entered into other agreements with Steel and Monona.

The understanding between Associates and Monona is evidenced by a commitment and building-loan agreement

entered into December 8, 1965, which provided the disbursement of the funds to contractors would not exceed 90 percent of the total value of all the work completed by them and approved by Associates; the disbursements would be made through the Chicago Title & Trust Company as disbursing agent upon instruction from Associates; and, among other things, Associates would not be obligated to make disbursements unless evidence was furnished by Monona establishing that the remaining undisbursed amount of the loan would be sufficient to cover the remaining costs, interest, taxes, loan fees (which originally totaled $213,750), and other anticipated costs. To meet the requirements of the Equitable commitment, Monona also on December 8, 1965, executed and delivered to Republic as substituted evidence of indebtedness six mortgage notes back-dated to July 13, 1965, aggregating $3,500,000 of the same tenor as was the original mortgage note. These notes were endorsed by Republic to Associates.

Construction started in the fall of 1965 and in the late summer of 1966 the plaintiff discovered the mortgage proceeds would probably be insufficient to cover the remaining projected cost. This insufficiency of funds was brought to the attention of Monona in September and after numerous conferences it acknowledged a shortage of funds in October of 1966. As of this time a little over $3,000,000 of the loan had been disbursed. On November 11th Associates failed to pay the AIC loan-fee commitment. Associates was told by Monona that funds necessary to complete the project would be made available by its selling a part interest in the project to a real-estate-investment fund and requested Associates' consent as required by the loan documents. After the negotiations for this sale for $750,000 terminated unsuccessfully in January of 1967, Associates requested Monona to furnish an up-to-date cost breakdown of the remaining costs to complete the project by January 28, 1967. Monona failed

to produce this information and the mortgage-loan interest due that month and the real estate taxes for 1966 were not paid when due. By March 1, 1967, all work on the project had ceased and this action was commenced in April of 1967.

The evidence relating to various conferences and attempts to breathe life into this dying project is conflicting and will be referred to only when necessary in connection with specific issues.

### Appeal of Monona Shores

#### (a) Jury Trial.

Monona argues it is entitled to a jury trial on the issue of Associates' negligent breach of contract. It is claimed this is asserted in a counterclaim, but whatever is asserted on this issue is found only in the answer. The alleged breach concerns Associates' failure to pay the AIC loan fee of $12,500 on November 11, 1966. As a separate cause of action for damages, the allegation of this breach is insufficient and can only be treated as a defense to the equitable cause of action asserted in the complaint. A counterclaim must be pleaded as such. Sec. 263.14 (2), Stats.

The majority rule is that a legal response including a counterclaim in an equity suit does not create a right to a jury trial on that issue in the absence of a statute or rule of procedure. 47 Am. Jur. 2d, *Jury*, p. 655, sec. 36. This seems to be the rule in Wisconsin at least as to issues raised in the complaint or the answer. *Callanan v. Judd* (1868), 23 Wis. 343. In *Wilson v. Johnson* (1889), 74 Wis. 337, 43 N. W. 148, a counterclaim was interposed for loss of the use of the defendant's mare in an equity suit to impress a lien on the mare for keeping. The demand for a jury trial was denied. In *Neff v. Barber* (1917), 165 Wis. 503, 506, 162 N. W. 667, the court

said in an action in equity all the issues, whether legal or equitable, are triable by the court but it does not appear a legal counterclaim was involved.

Monona relies on sec. 270.07 (1), Stats., and *Neas v. Siemens* (1960), 10 Wis. 2d 47, 102 N. W. 2d 259, for a right to a jury trial on a counterclaim raising a legal issue in an equity suit. We are not here concerned with a legal counterclaim but we point out that *Neas* probably states too broadly a principle in respect to a legal counterclaim in an equity action. There is considerable logic and merit in the view that when a defendant pleads a legal counterclaim in an equitable action which he is not compelled to do he waives any right to a jury trial he would have if he had brought the action separately. The traditional and constitutional power of a court of equity is to try the facts before it and it is questionable whether one can voluntarily seek its aid and demand a jury trial. This reasoning is not applicable if the defendant is compelled by law to assert the counterclaim because he has no choice. The cases construing Rule 13 (a) of the Federal Rules of Civil Procedure hold that where a defendant is compulsorily required under the rule to assert as a counterclaim any claim he has against the opposing party if it arises out of the transaction or occurrence that is the subject matter of the action that he is entitled to a jury trial if the counterclaim asserts a legal right in an equitable suit. If, however, the defendant is under no such compulsion and asserts the legal right in a counterclaim in an equity suit, he thereby waives his right to a jury trial on that issue. *See* cases cited in 17 A. L. R. 3d 1321; Annot. (1968), *Right in equity suit to jury trial of counterclaim involving legal issue,* p. 1342, sec. 6.

We do not think sec. 270.07 (1), Stats.,[1] necessarily compels a jury trial on a legal issue in a counterclaim

---

[1] "270.07 Issues, by whom tried, when tried. (1) An issue of fact in an action for the recovery of money only, or of real or personal property or for divorce or legal separation on the ground of adultery, must be tried by a jury except as otherwise provided

in an equity suit. It has never been construed to require a jury trial on legal defensive matters of fact in an equity suit. *Neas,* in holding the defendant was entitled to a jury trial under sec. 270.07 (1) on his counterclaim, did not consider whether the counterclaim was compulsory or voluntary.

## (b) Real Party in Interest.

Monona, relying on *Landauer v. Espenhain* (1897), 95 Wis. 169, 70 N. W. 287, contends Associates is not the real party in interest under sec. 260.13, Stats.,[2] and therefore cannot prosecute this action. This argument claims that because Associates on January 31, 1966, assigned the note and mortgage of July 13, 1965, and other documents to Steel without recourse, the legal title to the debt and the mortgage sought to be foreclosed is in Steel, not Associates. This partial view of the facts entirely overlooks that this assignment ostensibly without recourse was made pursuant to a financing agreement between Associates, Monona, and Steel, to secure the funds which Associates loaned Monona. This financial agreement required the pledging of the contract documents constituting Monona's mortgage loan to secure Associates' two-year cognovit note to Steel which was the basic evidence of the debt for the $3,500,000 loan from Steel. This pledging of security took the form of an absolute assignment, but the form of the assignment is not controlling. Nor is the fact controlling that Steel

in this chapter and except that equitable defenses or counterclaims are triable by the court. Every other issue must be tried by the court, but the court may order the whole issue or any specific question of fact involved therein to be tried by a jury; or may refer an issue as provided in s. 270.34."

[2] "260.13 **Real party in interest must prosecute.** Every action must be prosecuted in the name of the real party in interest except as otherwise provided in section 260.15."

made the money available to Associates pursuant to the agreement by wiring such funds directly to the bank account of the Chicago Title & Trust Company.

The real party in interest within the meaning of sec. 260.13, Stats., is one who has a right to control and receive the fruits of the litigation. *Gross v. Heckert* (1904), 120 Wis. 314, 320, 97 N. W. 952; *see also Marshfield Clinic v. Doege* (1955), 269 Wis. 519, 523, 69 N. W. 2d 558; *Schwartz v. Evangelical Deaconess Society* (1970), 46 Wis. 2d 432, 175 N. W. 2d 225. It was stated in *State ex rel. State Bar v. Bonded Collections* (1967), 36 Wis. 2d 643, 651, 154 N. W. 2d 250, 254, that a fundamental test is whether the prosecution of the action will save the defendant from further harassment for the same demand, will cut the defendant off from any just defense, offset, or counterclaim against the demand, and whether the discharge of the judgment in behalf of the party suing will fully protect the defendant. *See also* 2 Bancroft, *Code Practice and Remedies,* p. 1094, sec. 749. In this case, Steel was a party to the action; there is no defense, offset or counterclaim claimed against anyone but Associates and a satisfaction of the judgment of foreclosure by way of payment would be binding upon Steel.

## (c) Consideration.

Monona further contends the original mortgage note is without consideration and the mortgage secured only that note and consequently a debtor-creditor relationship does not exist between it and Associates. This argument is based upon the fact the original note and mortgage were between Monona and Republic and no money was given by Republic for the note. This is a sophomoric argument for one engaged in complicated construction financing and is without merit.

Monona agreed to the assignment of the original note by Republic to Associates after it had arranged to have Associates provide the interim-construction financing. Substituted notes were required by the Equitable commitment but the substitution does not invalidate the mortgage. A promissory note is not the debt but only evidence thereof and there is no question that money was loaned by Associates and a debt created evidenced by the notes and mortgage involved in this suit.

### (d) Negligent Breach of Contract.

In an attempt to shift the blame for the failure to complete the project and for breaches, Monona asserts Associates breached the commitment and building-loan agreement because it did not pay the interest, taxes, and loan fees on behalf of Monona. The trial court correctly answered this argument when it pointed out that the commitment and building-loan agreement specifically relieved Associates of any obligation to pay interest, insurance, taxes, and loan fees when it appeared that the undisbursed funds were not sufficient to complete the project. At the time the interest and taxes were due, Monona was hopelessly short of sufficient funds to complete the project either from the loan or any other source. The estimate at this time was it would take $750,000 more to complete the project. Whether this was because of incorrect estimates of Monona, the failure to secure construction bids, or increased prices and unseen costs is not apparent, but in any event it was Monona's responsibility to have sufficient funds by loan or otherwise to completely build the project.

It is quite true that at the time AIC's renewal fee was due, Associates had sufficient funds to pay it; and there is some testimony that it goofed or was negligent in not paying it. But the fact remains that under the

agreement Associates was not required to pay it as long as Monona had not made available sufficient funds over and above the borrowed funds to complete the project. Even the AIC funds would have been only of a temporary help and postponed the day of reckoning. The failure of this project was inherent in the building scheme and financing conceived by Monona. It is difficult enough to pull oneself up by his boot straps, but by hindsight this record does not disclose there was even a strap on the boot.

Monona argues Associates failed to give it notice of defaults required by the mortgage and by *Haase v. Blank* (1922), 177 Wis. 17, 187 N. W. 669, on equitable grounds. The purpose of the notice of default is to give the mortgagor a reasonable chance to cure it and avoid a foreclosure. Here, Monona was fully aware of its defaults and the immediate need for money. It had knowledge as early as September, 1965, that its original financing was not sufficient. We consider the failure to give a formal notice of default before bringing this action six months later to be harmless and Monona's argument to be without merit.

### (e) Promissory Estoppel.

The theory of promissory estoppel is advanced as a reason for denying foreclosure to Associates. Monona relies on *Hoffman v. Red Owl Stores, Inc.* (1965), 26 Wis. 2d 683, 133 N. W. 2d 267, in which this court adopted the doctrine embodied in Vol. 1, sec. 90 of the Restatement, *Contracts*, p. 110.[3] Monona argues that

---

[3] "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

Associates repeatedly claimed after its failure to keep available the AIC commitment, it was in a position to assist Monona in obtaining any and all necessary financing to complete the project. It is argued that Associates made a long line of promises to obtain for Monona the financing necessary and Associates could reasonably expect Monona to forbear from obtaining financing on its own behalf and such inaction by Monona was induced solely by these promises.

The difficulty with this argument on appeal is that the trial court found no such promises were made by Associates, but rather, that Associates did request Monona to furnish enough money over and above the undisbursed funds of the loan to complete the project, which Monona was obligated to do, and that Associates would try to procure the necessary mortgage funds to replace the AIC commitment. This court will not reverse a finding of fact by the trial court unless it is against the great weight and clear preponderance of the evidence and the evidence in favor of Monona's position that Associates represented it would raise all the money necessary to finish the project does not meet this standard.

(f) Damages.

Lastly, Monona argues the trial court erred when it refused to enter findings determining its damages which flowed from the acts of Associates. Damages are claimed for the loss in market value by reason of the increased interest rates of a first mortgage to replace the Equitable mortgage and the financing fees paid which produced no loans. These and other items Monona claims amount to a total damage of over $1,000,000. There was no error in failing to make a finding of damages because the court did not find any breach upon which the damages could be based.

*Appeal by Fish Building Supply, Inc.; and Alex Temkin, d/b/a Temco Steel Supply Co.*

These contractors contend Associates, Russell Lesperance, Lesperance Builders, Inc., and Monona were engaged in a joint venture and the mortgage was in fact a capital contribution, making Associates liable for their claims, and in any event subordinated to the claims of the lienholders. The trial court found Associates was not engaged in a joint venture and we think the trial court was correct. To constitute a joint venture we stated in *Edlebeck v. Hooten* (1963), 20 Wis. 2d 83, 121 N. W. 2d 240, and in *Estate of Starer* (1963), 20 Wis. 2d 268, 270, 121 N. W. 2d 872, that the following elements must exist: (1) Contribution of money or services; (2) joint or mutual control; (3) an agreement to share profits although not necessarily the losses; and (4) a contract establishing the relationship. A joint venture may exist between corporations and individuals but there must be an intent on the part of all parties to create a joint venture. *Jolin v. Oster* (1969), 44 Wis. 2d 623, 172 N. W. 2d 12. Here, neither Associates nor Monona intended a joint venture in any legal sense. These two companies, Steel, and Equitable all were interested and involved in the project and worked together, but such activity alone does not constitute them joint principals in the enterprise. The relationship of Associates was strictly one of a lender of money. True, Associates borrowed this money from Steel through an arrangement instituted by Monona, but all the documents make the financing a loan and not a contribution of capital.

There is no agreement to share any profits of this project. Loan fees and interest were paid but these are not profits but rather from a joint-venture standpoint such items are expenses. The only control over the project by Associates consisted of the financial control

which is customary in construction loans and was not based upon proprietorship but upon concern that the money loaned would be properly used to create the security pledged. These mortgages and documents cannot be read to constitute a joint-venture agreement or anything other than what they are purported to be. *See* 48 C. J. S., *Joint Adventures*, p. 804, sec. 1.

*Appeal of Harold's Painting and Decorating Company; National Bank of North Chicago; and Grimm Masonry.*

These appellants claim priority for their liens over the mortgage of Associates on the basis of equitable estoppel. The trial court found no affirmative representations were made by Associates as claimed in the brief of these claimants and their active contact as subcontractors with Associates was only in respect to the payment procedures. An estoppel therefore must rest upon silence or inaction under circumstances which require action or disclosure.

These claimants contend Associates owed them a duty to disclose that the mortgage loan was in default and its failure amounted to a concealment of material facts with the intent to influence the conduct of the claimants. The trial court found Associates had no duty to make any disclosure to the subcontractors concerning the status of the loan and the lien claimants made their own bargain and their own contract with Monona and were not induced to enter into such contracts by Associates. There was some testimony that after the letter of September 1, 1966, from Associates to Monona regarding Monona's default, Associates allowed the subcontractors to continue to work. It may be true if Associates had disclosed the default to the subcontractors they would have discontinued their services. This may satisfy the element of reliance if there was a duty to speak.

To give rise to an estoppel by silence or inaction, there must be a right and an opportunity to speak and an obligation or duty to do so. *Eau Claire Dells Improvement Co. v. Eau Claire* (1920), 172 Wis. 240, 179 N. W. 2d 2; *H. W. Wright Lumber Co. v. McCord* (1911), 145 Wis. 93, 128 N. W. 873; 28 Am. Jur. 2d, *Estoppel and Waiver,* pp. 667, 668, sec. 53; *Estate of Gibson* (1959), 7 Wis. 2d 506, 96 N. W. 2d 859. In the ordinary case of a first mortgage and subcontracts, there exists no duty on the part of the mortgagee to disclose pending or threatening defaults to contractors.

It is argued that a duty should be found or inferred to encompass the facts of this case because Associates had greater experience, knowledge, and ability to protect itself and should in protecting itself also protect less knowledgeable lien claimants from irresponsible construction ventures. This theory is founded upon public policy that a lender of money to finance a public-interested low-cost-housing project owes a duty of care to the innocent members of the public who may purchase them. Such a duty it is claimed was recognized in *Connor v. Conejo Valley Development Co.* (1967), 61 Cal. Rptr. 333 (1968), 73 Cal. Rptr. 369, 447 Pac. 2d 609. In that case, the lender of a construction loan was held liable with the developer for substantial structural defects of homes built on shifting-clay terrain. The court found a duty in public policy to protect low-income home purchasers from gross structural hazards. While this case approaches such a factual point, we do not believe Associates had a duty to insure the financial stability of the venture to the subcontractors. Although one must wonder how an experienced lender of money could loan money on the Monona project, there is no evidence Associates was negligent in making this loan or responsible for the collapse of the project. Public policy does not command that financial institutions must insure construction projects.

*Appeal of W. O. Zimmerman, Inc.*

(a) Accrual of Mechanics' Liens.

Sometime prior to July 1, 1965, the surveyor placed on the site 35 lath stakes with orange ribbons attached to indicate the street layout and to show prospective bidders how much cut or fill would be required to grade the streets. The mortgage was recorded on August 5th and no claims for liens had been filed at that date. Grading work on the streets commenced on August 13th. On August 9th the staking for excavation and foundations for the buildings was completed and excavating commenced in December. It is claimed under sec. 289.01 (2) (b) [4] and sec. 289.01 (1) (b), Stats. 1965,[5] that the staking of the streets constituted "the visible commencement of work in the place of the improvement" and thus all the liens of the claimants relate back to the date of staking of the streets by the surveyor.

It is a rule of long-standing that every construction lien shall have priority as of the time of visible commencement of the improvement work at the site as against an unrecorded mortgage given prior to the com-

---

[4] "289.01 Contractors' liens. . . .

"(2) EXTENT AND CHARACTER OF LIEN. . . .

"(b) Such lien shall be prior to any lien which originates subsequent to the visible commencement in place of the work of improvement, except as otherwise provided by ss. 215.21 (4) (a) and 235.70. The lien shall also be prior to any unrecorded mortgage given prior to the commencement of the improvement, but of which the lienor has no notice."

[5] "289.01 Contractors' liens. (1) DEFINITION. In this chapter unless the context or subject matter otherwise requires: . . .

"(b) 'Improvement' includes any building, structure, erection, fixture, demolition, alteration, excavation, filling, grading, tiling, planting, clearing, landscaping, built, erected, made or done on or to land for its permanent benefit. This enumeration is an extension of the meaning and scope of improvement."

mencement of the improvement. This doctrine of accrual of mechanics' liens does not depend upon which lien contractor started the work on the key day because if there is a valid construction lien prior to a mortgage under sec. 289.01, Stats., all other construction liens relate back to that priority, *i.e.*, the commencement of the work of improvement prior to the recording of the mortgage. *Prince v. C. G. Bretting Mfg. Co.* (1931), 203 Wis. 504, 234 N. W. 699; *Evans-Lee Co. v. Hoton* (1926), 190 Wis. 207, 208 N. W. 872.

The placing of grade stakes for a street does not constitute an improvement because such work does not fall within the statutory definition of an improvement in sec. 289.01 (1) (b), Stats. Staking streets *per se* is not of permanent value to the land and cannot constitute an improvement. It is a preliminary means to grading or excavating, which would be of permanent value to the land, and cannot constitute an improvement. It is a preliminary means to grading or excavating which would be of permanent value and which are expressly included in the statutory definition of improvement. We see no significance in the stakes marking out streets rather than foundations for buildings because excavating or grading is done on the land of the project. While excavating, grading, and other work short of constructing a building are an extension of the meaning and scope of "improvement," staking is not so enumerated in the statute.

In *Clark v. Smith* (1940), 234 Wis. 138, 290 N. W. 592, an architect was denied a lien for the preparation of plans because the building called for in the plans was not commenced. In *Fitzgerald v. Walsh* (1900), 107 Wis. 92, 82 N. W. 717, architectural plans for a building were drawn and used for negotiating contracts with contractors and in setting the stakes for the excavation of the basement; it was held the commencement of the

excavation was the commencement of the building within the meaning of the statute. While neither of these cases considered the question here presented, the Minnesota court in *M. E. Kraft Excavating & Grading Co. v. Barac Construction Co.* (1968), 279 Minn. 278, 156 N. W. 2d 748, held that survey stakes under a statute similar to Wisconsin's did not constitute actual or visible beginning of the improvement and the priority of the subsequently recorded mortgage was upheld.

This view is taken in a recent amendment by ch. 351, Laws of 1967, to our lien law which became effective February, 1968, after the rights in this case accrued. What was sec. 289.01 (2) (b) is now sec. 289.01 (4), Stats., and provides "When new construction is the principal improvement involved, commencement is deemed to occur no earlier than the beginning of substantial excavation for the foundations, footings or base of the new construction, . . ." The legislative note accompanying this revised section states no substantial change was made. The notes of Walter B. Raushenbush, the research reporter and legislative draftsman for the study of the Wisconsin lien laws states in *Wisconsin Construction Lien Law* (1968), CLEW, pp. 42–45, this new section was a clarification of the meaning of the phrase "visible commencement in place of the work of improvement," because "there was a concern that the placing of surveyor's stakes . . . was, after all, visible commencement of the work." For the division of authority holding staking, measuring, and fencing of property as determinative of the accrual of mechanic's liens, *see* 1 A. L. R. 3d, *Mechanic's Lien—Accrual*, (1965), 822, 825–828. While a meritorious argument is made in the briefs why staking should be determinative of the priority of construction liens, we think the language of secs. 289.01 (1) (b) and 289.01 (2) (b), Stats. 1965, did not encompass staking as a visible commencement of the improvement work.

### (b) Holdbacks.

The lien claimants argue they are entitled to the 10 percent holdbacks on the theory this money is presently due and owing to them on the theory of a third-party-beneficiary contract, a trust, or an escrow. The commitment and building-loan agreement between Associates and Monona and the financing agreement between these parties and Steel and the contracts of the subcontractors all provided for the payment of 90 percent of the value of the work performed, although waivers were required for 100 percent. Ultimately when the work was completed and finally accepted, the so-called holdback would be paid. The financing agreements also provided Associates need not make disbursements unless in addition to the lien waivers there was evidence to demonstrate that the undisbursed funds were sufficient to pay the remaining costs of construction and there were no defaults. The trial court correctly held Associates under the terms of its contract was not obligated to pay out the holdbacks because of Monona's breach.

The cases relied on by the claimants for payment on a trust-fund doctrine are not applicable. The constructive trust is an invention of equity by which it imposes liability to prevent unjust enrichment and unfairness. *Milwaukee v. Firemen Relief Asso.* (1967), 34 Wis. 2d 350, 360, 149 N. W. 2d 589; *Masino v. Sechrest* (1954), 268 Wis. 101, 66 N. W. 2d 740; Bogert, *Law of Trusts* (4th ed. 1963), p. 208, sec. 77. Holdback provisions in construction contracts are frequently included for the benefit of the owner or for the joint benefit of the owner and the contractor's surety or lender. *Quinn v. United States* (1879), 99 U. S. 30, 25 L. Ed. 269; 13 Am. Jur. 2d, *Building Contracts,* p. 23, sec. 21; see Annot. (1937), *Construction and application of provision of construction contract as regards retention of percentage of current earnings until completion,* 107 A. L. R. 961.

Where the mortgagor or the mortgagee has received all that he is entitled to receive by way of performance or security, the holdback or the amount thereof less any actual damages must be paid. *Dullaghan v. Fitch* (1877), 42 Wis. 679; *Philadelphia, Wilmington & Baltimore Railroad Co. v. Howard* (1851), 54 U. S. (13 How.) 307, 14 L. Ed. 157; *Whiting-Meade Co. v. West Coast Bond and Mortgage Co.* (1944), 66 Cal. App. 2d 460, 152 Pac. 2d 629; *Ralph C. Sutro Co. v. Paramount Plastering, Inc.* (1963), 216 Cal. App. 2d 433, 31 Cal. Rptr. 174. In this case there was no agreement between Associates and the lienholders to pay them any money other than disbursing loan funds on the conditions of the loan agreement with Monona. This is not a case of surplus funds or retained funds waiting to be disbursed only on the completion of the claimants' work. The project was not completed and Associates did not receive what it bargained for and its contract does not require payment. Associates has a mortgage but it is now subject to a $1,800,000 lien representing the cost of completing this project by the receiver in this action. Consequently, it cannot be said that Associates is unjustly enriched by not paying out the holdbacks and it would be inequitable to impress a constructive trust to do so.

Recovery cannot be had under the theory of a third-party-beneficiary contract. This doctrine is discussed in *Winnebago Homes, Inc. v. Sheldon* (1966), 29 Wis. 2d 692, 139 N. W. 2d 606. In order to constitute these subcontractors a third-party beneficiary there must be a promise or the specific intention to benefit them in the agreement between Monona and Associates and the agreement must be made directly and primarily for the subcontractor's benefit. *State Department of Public Welfare v. Schmidt* (1949), 255 Wis. 452, 39 N. W. 2d 392. The loaning of money to finance the construction of a building and thus pay contractors is not a third-party-beneficiary contract. While such a contract indirectly

inures to the benefit of the contractors, generally there is no specific provision for their direct benefit. But even if the contract between Monona and Associates were a third-party contract, the third-party beneficiaries' rights would be subject to the conditions requiring Associates to make the payments and Associates has a defense to the demands.

The escrow theory likewise has no merit. To constitute an escrow, there must be contractual language establishing the funds in escrow. All we have in this record is an agreement to loan money upon certain conditions and to make payouts on behalf of the mortgagor on certain conditions. The agreement to loan did not establish an escrow fund and the contracts with the subcontractors did not establish one.

There are other miscellaneous issues such as the restriction of testimony of the lienholders regarding their reliance upon payout procedures and a denial of a motion to modify findings. We have given consideration to them but find they are without merit and do not warrant discussion.

*By the Court.*—Judgment affirmed.