No. 87,393

STATE OF KANSAS *ex rel.* CARLA J. STOVALL, *Appellant,* v. RELIANCE INSURANCE COMPANY, GEORGE M. MYERS, INC., d/b/a GMM, INC., PROFESSIONAL MECHANICAL CONTRACTORS, INC., DEAN E. NORRIS, INC., and AMERICAN THERMAL PRODUCTS, INC., *Appellees.*

(107 P.3d 1219)

Modified opinion filed January 21, 2005.

*Paul G. Schepers*, of Seigfreid, Bingham, Levy, Selzer & Gee, P.C., of Kansas City, Missouri, argued the cause, and *Duane Fox*, of the same firm, and *Eliehue Brunson* and *Scott Poor*, assistant attorneys general, were with him on the briefs for appellant.

*Donald Patterson*, of Fisher, Patterson, Sayler & Smith, L.L.P., of Topeka, argued the cause, and *James P. Nordstrom*, of the same firm, was with him on the brief for appellee American Thermal Products, Inc.

*Wyatt A. Hoch*, of Foulston Siefkin LLP, of Wichita, argued the cause, and *James D. Oliver*, of the same firm, was with him on the brief for appellees George M. Myers, Inc., d/b/a GMM, Inc., and Reliance Insurance Company.

*Eric T. Swanson*, of Harris, McCausland & Schmitt, P.C., of Kansas City, Missouri, argued the cause, and *Matthew F. Mulhern* and *Ronald D. Montieth*, of the same firm, were with him on the brief for appellees Professional Mechanical Contractors, Inc., and Dean E. Norris, Inc.

*Per Curiam:* This litigation arises from the failure of the underground thermal piping system for heating and cooling at the El Dorado Correction Facility (EDCF). The State sued various entities believed responsible for the defective construction, including George M. Myers, Inc., d/b/a GMM, Inc. (GMM), Professional Mechanical Contractors, Inc. (PMC), Dean E. Norris, Inc. (DEN), and American Thermal Products, Inc. (ATP). The district court

entered final orders which fixed the amount of the State's potential recovery against GMM and its surety, Reliance Insurance Company (Reliance), and dismissed the State's third-party beneficiary claims against PMC, DEN, and ATP. The State's applications for interlocutory appeal and notices of appeal were timely filed, and the appeal was granted. The appeal is before this court pursuant to a K.S.A. 20-3018(c) transfer. We filed our original opinion in this case on June 18, 2004 (*State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 3, 91 P.3d 531). On July 8, 2004, the State filed a timely motion to clarify or modify that opinion. We grant the motion to modify, order the original opinion withdrawn from publication, and file this modified opinion.

Two issues are raised on appeal:
1. Did the district court err in fixing the amount of the State's potential recovery of damages? Our answer is, "Yes."
2. Did the district court err in dismissing the State's third-party beneficiary claims? Our answer is, "No."

We affirm in part, reverse in part, and remand for further proceedings.

### The Underlying Circumstances and Proceedings

In 1989, under federal court order, the State undertook construction of a 1,000-bed maximum security prison in El Dorado, Kansas. The State employed a multi-bid prime contracting scheme under which several contractors contracted directly with the State for various phases of the project. The State employed Booker & Associates (Booker) as construction manager to coordinate the activities of the various prime contractors. The $50 million project was completed in 1992.

GMM constructed the prison's site utilities pursuant to a $6.5 million lump sum contract with the State. For contract billing purposes, GMM allocated approximately $1.097 million of its contract to the cost of the 3,900-foot long underground thermal piping system. The State has stipulated, for purposes of the summary judgment motions giving rise to this appeal, that the State's cost for the original underground thermal piping system was $1.097 million.

The underground thermal system pipes transport chilled water and steam at temperatures in excess of 300°F from the central plant to all the buildings in the facility. The contract required GMM to insulate the system for the underground pipes to meet performance criteria set out in the contract. Generally, the insulation system was to insulate the pipes to approximately 100°F where the system interfaces with the soil and to protect the pipe exteriors from corrosive moisture.

Different types of underground thermal piping systems for heating and cooling fall into several broad categories: (1) walk-through utility tunnels; (2) shallow concrete trenches; (3) direct-bury preinsulated piping; and (4) direct-bury piping with a poured-in-place insulation envelope. Walk-through tunnel systems cost the most initially but have the lowest lifetime costs due to ease of access, maintenance, and correction of maintenance errors. Shallow concrete trenches are usually the next most expensive system, followed by direct-bury preinsulated piping, and then direct-bury piping with poured-in-place insulation.

The State's design team initially recommended a walk-through tunnel system but rejected the idea due to cost and security concerns. It found that the direct-bury pipe with poured-in-place insulation was the lowest cost alternative.

The project mechanical engineer, Professional Engineering Consultants, P.A. (PEC), warned the State that "[a]though the poured-in-place insulation system appears to offer considerable first savings, our firm has no past experience with this method and has some skepticism regarding the long term insulating value of the material." PEC therefore recommended that the State solicit construction bids setting forth prices for not only poured-in-place insulation but also the preinsulated piping alternative.

GMM subcontracted with Professional Mechanical Contractors, Inc. (PMC) for the installation of the underground thermal system to meet the performance criteria specified by the State. PMC in turn entered into a contract with American Thermal Products, Inc. (ATP) for the design of a preengineered insulation system to meet the performance criteria for the underground thermal system.

There were no direct contracts between the State and the subcontractors.

During the design process, the State's representatives met with representatives of ATP and its sales representative, R.B. Summers Associates, Inc. (Summers), concerning ATP's insulation product, Gilsulate 500xr. The State later chose the poured-in-place insulation alternative. In its first amended petition, the State alleged that it approved the use of Gilsulate 500xr as the poured-in-place insulation around all the underground thermal piping based on the representations of ATP and Summers. ATP's president stated that such a system, if properly installed, was a "zero maintenance" system.

The State contends that ATP provided a preengineered insulation system that included, in addition to the Gilsulate 500xr insulation, the design for the pipe guides, pipe anchors, pipe expansion loops, insulation thickness details and calculations, and heat transfer calculations. PMC eventually installed ATP's system by placing the pipe and ancillary features into an open earthen trench, encasing the pipes in a formed envelope of dry-powdered Gilsulate 500xr insulation, then backfilling the trench with sand and soil. The district court and the parties referred to this as an "earthen trench" system.

The site utilities package work awarded to GMM under its contract with the State was substantially completed in May 1991. The EDCF staff soon began reporting problems with the steam condensate return system, which appeared to be the result of malfunctioning steam traps throughout the thermal piping system. By the end of 1991 there were indications that high heat was escaping from various areas of the underground thermal system. The first symptoms were dead grass and melted snow above the steam pipes in an area outside the prison fence. The State notified GMM of the problems within 1 year of completion but claims that GMM did not return to the site to investigate further during the warranty period.

Excavations identified construction defects by PMC, and an infrared survey revealed hot spots. Excavators noted wet insulation, improperly installed pipe support anchors, wood blocks being used

as pipe supports, lack of flashing above pipe penetrations in the manholes, and inadequate insulation coverage.

The State also attributed damage to other underground lines situated near the underground steam pipes—including fire alarm, fiber optic telephone, energy management, electric, and water lines—to the failure of the earthen trench system. In approximately October 1999, the State abandoned this earthen trench system and installed a concrete shallow trench system.

On November 26, 1997, the State filed suit against Gossen, Livingston & Associates (Gossen), the project architect; PEC, the mechanical engineering consultant; Booker, the construction manager; GMM, the contractor for the underground thermal system and its surety, Reliance; PMC, GMM's installation subcontractor; DEN, alleged by the State to be the parent company of PMC; and ATP, the subcontractor to PMC. The State alleged that a combination of product defects and design and installation errors caused a failure of the system over time.

Under the State's theory, it alleged that (1) GMM, PMC, and ATP breached their contracts by failing to provide materials and work in compliance with the contract documents, (2) the Gilsulate 500xr system was not reasonably suited for the use to which it was applied at the prison, and (3) the most reasonable solution was to abandon the earthen trench system and replace it with a concrete trench system, which was done at a lower cost than repairing or replacing it with another earthen trench system.

DEN filed a motion for summary judgment in September 1999, contending that it had not entered a contract involving Bid Package 3A, had performed no work at the prison, and, as a matter of law, should not be made a party to the lawsuit.

On February 10, 2000, PEC filed a motion in limine to determine the measure of damages. Defendants GMM, ATP, and PMC joined the motion, arguing that the concrete trench system was a "trade-up" to a better system than the earthen trench system. Although for purposes of the motion the defendants stipulated that the earthen trench system had failed and was necessarily abandoned and replaced, the defendants urged the court to reject the typical repair or replacement cost measure of recovery.

They argued the court should instead apply the economic waste exception, which would limit damages to diminished value. As a result, they argued that the diminished value was at most the difference between the value of the earthen trench system in its defective condition ($0) and its value without defects, which they contended was the $1.097 million original cost of the system. They claimed that the State would receive a windfall if recovery was measured by the cost of the shallow concrete trench system.

On December 19, 2000, the district court entered an order ruling on the motion in limine. The district court framed the questions addressed as follows:

"The question to be decided by the Court is: 'If it is assumed that replacement of the underground thermal system was necessary, is the State's claim for reimbursement for its replacement costs limited to the original cost of installing the system?' Also: 'What date are we going to use to determine the breach for purposes of determining the amount of damages?' "

The district court was not clear as to the cost of installing the concrete trench system, stating: "[A]s the Court understands it, [the concrete trench system] cost $5,728,090." Although the State had identified repair and replacement costs of $5.7 million, it asserts on appeal that this figure included not only the cost of the concrete trench but also the cost of repairing other systems damaged by GMM's earthen trench system, *e.g.*, telephone lines.

The court concluded that "the State should not be awarded damages which would place it in a better position or with a better system than that originally contracted for and contemplated by the parties." According to the district court, placing an outside limit of damages at $5.7 million for the concrete trench system would award the State an improper windfall. In addition, the court was of the opinion "that present day costs of replacing an earthen trench system originally installed in 1991 is not the proper measure of damages."

The district court, however, also rejected defendants' argument that the State's recovery was limited to the original cost of the earthen trench system, stating:

"The Court finds that damages should be measured by the cost of installation of an earthen trench system on the date that plaintiff would have had notice that

a cause of action might be accruing, *i.e.*, the date that plaintiff became aware that the system was failing."

At the time the district court entered its order in limine, scant evidence, if any, had been provided to estimate the cost of repair or replacement of the earthen trench system. After the order was entered, the State proceeded to obtain evidence of what it would have cost to install an earthen trench system for the occupied prison in 1995, the time of discovery. The State retained an expert, William R. Bassette, P.E., who, according to his deposition transcript attached to the State's response to a motion for summary judgment, determined that the cost to replace the system with another earthen trench system at the time the State should have discovered the system failure varied from $4.5 million to $6.3 million, depending upon the alignment used. According to the State, that amount did not include the cost to repair other utilities damaged by the defective system, *e.g.*, telephone lines. The State asserted these figures were high primarily because of the difficulties in performing the construction work in an occupied prison.

Defendants and the State disagreed as to whether the limine order limited the State's replacement cost recovery to the original cost of the earthen trench system. After the State settled with Gossen, PEC, and Booker, the disagreement was presented to the court through a February 2001 summary judgment motion by GMM and Reliance. GMM and Reliance asserted that GMM was entitled to credit the amount of the prior settlements against the State's total damages. According to GMM and Reliance, the settlement amounts exceeded the State's damages and, thus, the State had been fully compensated. PMC and DEN then filed their own summary judgment motion and incorporated the same credit-for-settlements argument against the State. The State's response objected to disclosure of the specific amounts of confidential settlements but stipulated that settlement proceeds exceeded the original cost of the earthen trench system.

At a March 16, 2001, hearing, the State asked the district court to clarify whether the limine order limited replacement cost recovery to the original contract amount. The partial transcript of that hearing reflects the following comment by the district judge:

"I think that we want to go to the very end of my opinion because that when it's all said and done, what I was trying to summarize, will cap damages as of the date the plaintiffs first had notice that it would have a cause of action due to the system failure. And the costs of installation of an earthen trench system on such date, whatever that may be, would be the upper limit of possible damage claims.

"While I realize there could be some consequential damages . . . ."

Subcontractor ATP was the first of the defendants to file a motion for summary judgment. It argued that the Kansas Product Liability Act, K.S.A. 60-3301 *et seq.*, and the economic loss rule barred the State's tort claims against it for negligence, strict liability, breach of express warranty, and breach of implied warranty. According to ATP, a products liability action based on tort cannot be maintained in Kansas for purely economic losses, and the State's alleged damages were solely economic. Similarly, ATP argued that Kansas common law and the economic loss rule barred the State's claims for strict liability and negligence.

Subcontractor PMC also filed a motion for summary judgment. The stated purpose of the motion was to demonstrate that, as a matter of law, it had no direct contractual relationship with the State and that under the economic loss doctrine, the State could not maintain direct claims against PMC.

On May 16, 2001, in a memorandum decision and order, the district court granted motions for summary judgment to the subcontractors PMC and ATP. Then, by orders filed June 25, 2001, the district court further granted motions for summary judgment to GMM and Reliance, PMC and DEN, and ATP.

The district court found that all of the State's claims against GMM and Reliance for breach of contract, negligence, and breach of implied warranty arose out of the parties' written construction contract. It held that, as a matter of law, the existence of the contractual relationship barred the State's assertion of tort claims arising from GMM's performance of contractual obligations. The court further held that breach of contract was the State's only actionable claim against GMM and dismissed the State's tort-based claims against GMM and its surety, Reliance.

The district court noted its previous ruling that the State could not maintain negligence claims against the defendants because any

damages sustained by the State arose from contractual obligations, not negligence as a matter of law. It further found that there were no direct contracts between the State and any of the subcontractors and therefore held that the State could not maintain breach of contract claims against PMC, ATP, or DEN due to a lack of privity.

The court also found that any damages sustained by the State were economic in nature, including "damages to the existing thermal system and its respective parts, the cost of repairs and replacement of portions of the system and eventually the entire unit, heat loss and increased operating costs." It wrote that under *Professional Lens Plan, Inc. v. Polaris Leasing Corp.*, 234 Kan. 742, 750-55, 675 P.2d 887 (1984), "direct and consequential economic loss damages of a non-privity ultimate purchaser are not recoverable from the seller since public policy concerns [of] dangerous product personal injuries to consumers are not present." The district court also ruled out recovery for the State under its claims for breach of implied warranty.

Finally, the district court rejected the State's third-party beneficiary contract claims, stating:

"Plaintiff contends that it is a third party beneficiary and thus entitled to enforce claims directly against ATP, PMC or [DEN]. The purpose of the third party beneficiary rule is to allow parties to enforce a contract made for their benefit even if they were not a signatory to that contract. To apply third party beneficiary rules to the economic loss cases would be to completely ignore *Professional Lens* and the line of cases it represents. It would completely emasculate the economic loss doctrine. The Court does not believe third party beneficiary rules apply to the case at hand."

Next, the district court found that the State was limited to only one recovery for an injury or damage and that the State sought recovery from GMM and Reliance for the same injury or damage asserted against the settling defendants. Therefore, the district court held that GMM, the utilities general contractor, and Reliance, its surety, were entitled to a credit in the amount of the settlement funds already paid to the State. The court also held that "ATP and PMC/[DEN] are entitled to the same credit, to the extent the State's claims against them sound in contract."

A separate order filed June 25, 2001, memorialized the district court's order granting Reliance and GMM's second motion for summary judgment. Noting that all the State's direct claims against ATP, PMC, and DEN had been dismissed, the court wrote that the defendants had requested an order "limiting the State's total damages to $129,609.00—the State's maximum recovery for direct and incidental damages after credit for settlement proceeds already received by the State." The order set forth the following uncontroverted facts:

"1.   On December 18, 2000, the court issued an order on defendants' Motion in Limine regarding damages.

"2.   On March 16, 2001, the court 'clarified' its order by saying (as paraphrased by counsel) that the State will be limited to the cost of an earthen trench as of the date the State discovered that it would need to replace the existing utility trench, plus appropriate incidental damages.

"3.   In the prior motion for summary judgment it was established that the State paid [GMM] $1,097,000 for the original thermal piping system.

"4.   Bill Bassette, the State's only testifying expert, opined that the cost [of] inflation for site utility work for 1991 through 1994 would be two percent (2%) or less.

"5.   When the cost of inflation for site utility work is added to the original cost of the insulation system ($1,097,000), to 1995, the result is $1,187,428.

"6.   On April 14, 2000, the State filed its expert witness disclosures wherein it identified all of its damages, including its alleged incidental damages. Those incidental damages are comprised of three elements: (i) energy loss [with interest] of $1,360,466, as set forth on Disclosure p. 3, ¶ 3; (ii) cost for a new fiber optic 'backbone' in the amount of $228,869, set forth on Disclosure p. 15, ¶ 4.a.ii; and (iii) the cost of fiber optic tie-in the amount of $37,866, set forth on Disclosure p. 15, ¶ 4.a.iii. The Disclosure does not segregate the energy loss calculation into energy cost and prejudgment interest on energy costs."

The district court held, as a matter of law, "that energy losses (caused by heat loss from the steam piping and heat gain to the chilled water piping) and the installation of the fiber optic system comprise the universe of the State's consequential and incidental damages." The court found that the State's other damage categories arose from the replacement of the pipes, insulation, and associated utilities and, therefore, were direct damages. Moreover, the district court held that the State's maximum direct damage

award was fixed at $1,187,428, the amount it paid GMM for the earthen trench system in 1991 adjusted for inflation to 1995.

As for other damages, the district court found that the State's "maximum damages incidental to the alleged failure of the thermal piping system is $1,687,181." After adding the figure for maximum direct damages ($1,187,428) to the maximum incidental damages ($1,687,181), and applying credit for settlement monies previously received by the State, the district court held that "the State's maximum recovery against [GMM] and Reliance is $129,609."

As the parties are before this court on an interlocutory appeal, it is important to note that the State's tort claims against GMM and Reliance are not in issue on appeal and that the only issues regarding the contract claims concern damages. Moreover, the only issue on appeal concerning the State and defendants PMC, DEN, and ATP is whether third-party beneficiary contract claims can be brought; the State's tort claims against these defendants are not in issue on appeal.

## Standard of Review

" 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citation omitted.]" *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000) (quoting *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 [1999]).

## Measure of Damages

The State asserts the district court erred by fixing its direct damages as the original cost of the earthen trench system, $1,097,000, plus an additional amount for inflation through 1995, the outside date the State contends it discovered the system was failing, for a

total of $1,187,428. It persuasively argues the effect of the district court's order is to allow restitution, not damages for breach of contract. The State believes it is entitled to recover the costs to build the concrete trench system as those costs are less than would have been incurred to build a new earthen trench system.

Conversely, GMM contends the State's direct damages are limited, as a matter of law, to the difference in value between the original earthen trench system specified in the contract and the value of the system actually delivered. It argues to allow recovery for the cost of the new concrete trench system would constitute a windfall to the State. GMM relies on *Service Iron Foundry, Inc. v. M.A. Bell Co.*, 2 Kan. App. 2d 662, 679, 588 P.2d 463 (1978).

The basic principle of contract damages is to make a party whole by putting it in as good a position as the party would have been had the contract been performed. See *Kansas Power and Light Co. v. Thatcher*, 14 Kan. App. 2d 613, 616-17, 797 P.2d 162, *rev. denied* 247 Kan. 704 (1990). See also Restatement (Second) of Contracts § 344(a)(1979) (basic purpose of contract damages is to make a party whole by putting it in as good a position as the party would have been had the contract been performed). Moreover, not only must a party demonstrate breach of contract and injury; the law also requires that there be a reasonable basis for computation of damages. *English Village Properties, Inc. v. Boettcher & Lieurance Constr. Co.*, 7 Kan. App. 2d 307, 310-11, 640 P.2d 1282, *rev. denied* 231 Kan. 799 (1982) (quoting *Venable v. Import Volkswagen, Inc.*, 214 Kan. 43, 50, 519 P.2d 667 [1974]). A party is not entitled to recover damages "not the proximate result of the breach of contract and those which are remote, contingent, and speculative in character." *Apperson v. Security State Bank*, 215 Kan. 724, Syl. ¶ 7, 528 P.2d 1211 (1974).

We, of course, agree with the parties that the basic purpose of contract damages is to make a party whole, not recover a windfall.

We reject, however, GMM's argument that the holding in *Service Iron Foundry* controls. There, the foundry sued to recover damages for breach of warranty in connection with its purchase of a pollution control unit. The Court of Appeals affirmed the trial court's restriction of the foundry's damages to the original purchase

price and incidental expenses rather than the cost of a better, more expensive replacement—one that complied with the Kansas health codes—than had been originally bargained for by the parties. In short, the court refused to allow a windfall to the foundry. 2 Kan. App. 2d at 677-79.

By contrast, in the instant case, the State is not seeking a better system than had been bargained for in the contract with GMM. The State is simply seeking to replace the deficient earthen trench system with a concrete trench system at a cost less than would be incurred if a new and identical earthen trench system was constructed. There is no windfall that needs to be prevented.

The State did provide the district court with an evidentiary basis for its damage claim. In controverting GMM's second motion for summary judgment, the State submitted evidence of its expert, William Bassette, P.E., that the cost to replace the existing system with another earthen trench system at the time the State should have discovered system failure would be between $4.5 million and $6.3 million. As we previously noted, this large increase over the original contract price was ostensibly because, in the interim, the prison became fully operational and occupied with prisoners. Additionally, the State's response to GMM's second motion included a table of damages by type. In that table, the State claimed resulting damages of $4,039,326 as the cost of the concrete trench system.

For the foregoing reasons, we hold the district court erred in limiting the State's potential recovery of direct damages to the original cost of the earthen trench system, $1,097,000, plus an additional amount for inflation through 1995. The correct measure of damages is the cost to build the concrete trench system, not to exceed the cost to build an earthen trench system as of the 1995 discovery date.

The State also maintains that the district court erred in its classification of direct versus consequential damages. The district court held, as a matter of law, "energy losses (caused by heat loss from the steam piping and heat gain to the chilled water piping) and the installation of the fiber optic system comprise the universe of the State's consequential and incidental damages." It found that the State's other damages arose from the replacement of the pipes,

insulation, and associated utilities and, therefore, were direct damages.

Here, the parties are in privity of contract and the State is entitled to recover direct and consequential damages. We conclude the fundamental issue is what recovery will make the State whole but not result in a windfall. See, *State ex rel. Stephan v. Wolfenbarger & McCulley, P.A.,* 236 Kan. 183, Syl. ¶ 4, 690 P.2d 380 (1984); *Service Iron Foundry,* 2 Kan. App. 2d at 679.

Nonetheless, we must consider the additional categories of damages the State seeks to recover to ascertain whether any of these damages should be considered as within the ambit of costs to build the concrete trench system we have previously stated are not to exceed the cost to build an earthen trench system. The State identifies four categories and respective costs to be: (1) finance, design, and administrative costs incurred to construct the concrete trench system—$932,232; (2) costs of repair to the earthen trench system before abandonment—$608,058; (3) costs to repair damages to other utilities—$711,484; and (4) energy losses—$984,938.

We have already observed that in numbered paragraph 6 of the district court's order of June 25, 2001, granting Reliance and GMM's second motion for summary judgment, the court found the State's consequential damage claim consisted of three elements totaling $1,687,181. The State acknowledges the court's finding is based upon the State's April 14, 2000, expert witness disclosures but argues that the district court failed to consider that the damage category "replacement concrete trench and related work totaling $6,179,41" also included costs of repair damages to other utilities. This, according to the State, resulted in the district court inappropriately treating these additional damage claims as direct damages for replacement of the concrete trench subject to the cap of $1,187,428.

The State further contends that in its response to GMM's second motion for summary judgment it did provide the district court with the above categories of damages totaling $3,236,712. Further, that its representation was fully supported by record evidence or uncontroverted by the movants. We agree and conclude there exist genuine issues of fact that preclude the district court's grant of

summary judgment. However, we also conclude the State's claim of finance, design, and administrative costs totaling $932,232 should be considered as part of the direct costs to build the concrete trench system and thus included within the limitation on recovery not to exceed the costs to build an earthen trench system.

The balance of the State's damage claims are separate and apart from the State's direct costs to build the concrete trench system. Consequently, it is factually and legally inconsistent to subject these claims to the allowable maximum recovery for the costs to build the concrete trench system. We hold the State should be allowed to prove and, if proved, to recover these additional claims as will make the State whole.

Accordingly, the district court's grant of summary judgment to GMM and Reliance is reversed.

### Third-Party Beneficiary Claims

The State maintains that it can pursue third-party beneficiary contract claims against PMC, DEN, and ATP. The district court found that there were no direct contracts between the State and any of the subcontractors and that due to a lack of privity the State could not maintain breach of contract claims against PMC, ATP, or DEN. The district court rejected the State's breach of contract claims under a third-party beneficiary theory, stating:

"Plaintiff contends that it is a third party beneficiary and thus entitled to enforce claims directly against ATP, PMC or [DEN]. The purpose of the third party beneficiary rule is to allow parties to enforce a contract made for their benefit even if they were not a signatory to that contract. To apply third party beneficiary rules to the economic loss cases would be to completely ignore *Professional Lens* and the line of cases it represents. It would completely emasculate the economic loss doctrine. The Court does not believe third party beneficiary rules apply to the case at hand."

The State attacks the district court's order granting summary judgment in several ways.

### Lack of privity

The State begins by asserting that it has standing to maintain a contract action as a third-party beneficiary because the district court never specifically found that it was not a third-party benefi-

ciary of the subcontracts. This court observed in *Professional Lens Plan,* 234 Kan. 742, Syl. ¶ 1:

"Privity of contract is that connection or relationship which exists between two or more contracting parties. It is essential to the maintenance of any action on any contract that there should subsist a privity between the plaintiff and defendant in respect of the matter sued on."

Where a plaintiff and defendant lack privity, Kansas law allows a qualified third-party beneficiary plaintiff to enforce a contract expressly made for his or her benefit even though he or she was not a party to the transaction. See *Martin v. Edwards,* 219 Kan. 466, 472-73, 548 P.2d 779 (1976); PIK Civ. 3d 124.24. The State contends that third-party beneficiary claims are not barred by a lack of privity under *Pizel v. Zuspann,* 247 Kan. 54, 63, 795 P.2d 42, *modified* 247 Kan. 699, 803 P.2d 205 (1990); *Fasse v. Lower Heating & Air Conditioning, Inc.,* 241 Kan. 387, 736 P.2d 930 (1987); *Cornwell v. Jespersen,* 238 Kan. 110, 708 P.2d 515 (1985). This is not disputed.

PMC and DEN argue, however, that the State failed to plead a claim based on third-party beneficiary theory and only asserted the theory when confronted with the requirement of privity and the economic loss doctrine. PMC and DEN's procedural argument fails for the reason that the State's amended petition expressly alleged that both PMC and DEN "expressly agreed to the following relevant terms for the intended benefit of the [State]."

The burden of establishing standing to bring suit as a third party rests with the party asserting it. "Before the issue is reached of whether a third party may directly enforce a contract from which he would benefit, the third party must show the existence of some provision in the contract that operates to his benefit." *Hartford Fire Ins. Co. v. Western Fire Ins. Co.,* 226 Kan. 197, Syl. ¶ 5, 597 P.2d 622 (1979).

"To be a third party beneficiary to a contract, the contract must be made for the third party's benefit as its object, and he must be the party intended to be benefitted in order to be entitled to sue upon it. [Citation omitted.] The third party beneficiary can enforce the contract if he is one who the contracting parties intended should receive a direct benefit from the contract. Contracting parties are presumed to act for themselves and therefore an intent to benefit a third

person must be clearly expressed in the contract. [Citation omitted.] It is not necessary, however, that the third party be the exclusive beneficiary of all the promisor's performance. The contract may also benefit the contracting parties as well. [Citations omitted.]" *Fasse*, 241 Kan. at 389.

On appeal and before the district court, the State specified clauses in the subcontract between GMM, the general contractor, and DEN and PMC by which it alleges that the contracting parties intended to benefit the State. The State also sets forth similar evidence in regard to ATP's subcontract with DEN and PMC.

The district court failed to set forth any findings concerning the State's claimed status as a third-party beneficiary. Instead, it simply refused to apply third-party beneficiary rules to the case at hand.

"[T]he interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review. Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect. [Citation omitted.]" *Alexander v. Everhart*, 27 Kan. App. 2d 897, 901, 7 P.3d 1282, *rev. denied* 270 Kan. 897 (2000).

The State contends that as to PMC and DEN, evidence of intent to benefit the State within the subcontract includes: (1) an agreement to furnish materials, equipment, and labor necessary to perform all work in accordance with GMM's contract with the State; (2) the conditions and specifications of the contract between GMM and the State; and (3) an agreement to indemnify and hold harmless from "any and all loss, damage, costs, expenses and attorneys' fees suffered or incurred on account of any breach of . . . this contract."

As to ATP, the State points out that the provisions of ATP's subcontract with GMM under which ATP: (1) "agrees to be bound by the terms of the contract between the Owner, the General Contractor, if PMC is bound to the owner through a General Contractor, or any firm, person or individual functioning as such, and PMC as the case may be, and by the general conditions, special conditions, the plans, drawings and specifications as far as applicable to this Purchase Order," (2) agrees to "be bound to PMC by the terms of the contract between Owner and General Contractor or PMC and the General Contractor or Owner . . . and to assume toward PMC all the obligations and responsibilities that PMC . . .

assumes toward the Owner . . . insofar as they are applicable to the materials to be furnished under this Purchase Order," and (3) stated that "all material shall conform to & shall be in accordance with the project specifications."

As this court stated in *Noller v. General Motors Corp.*, 244 Kan. 612, 617, 772 P.2d 271 (1989):

"Knowledge that a contract will benefit a third party is not intent to benefit the third party. [Citation omitted.]

. . . .

"We have long held: 'Contracting parties are presumed to act for themselves and therefore an intent to benefit a third person must be clearly expressed in the contract. [Citation omitted.]' "

Section 302 of the Restatement (Second) of Contracts (1979) is in accord. It states as follows:

"(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or

(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

"(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."

Comment (e) to the Restatement states: "Performance of a contract will often benefit a third person. But unless the third person is an intended beneficiary as here defined, no duty to him is created." Restatement (Second) of Contracts § 302, comment e (1979).

The Restatement also provides general illustrations for comment (e). Illustration No. 19 states: "A contracts to erect a building for C. B then contracts with A to supply lumber needed for the building. C is an incidental beneficiary of B's promise, and B is an incidental beneficiary of C's promise to pay A for the building." Restatement (Second) of Contracts § 302, comment e, illus. 19 (1979).

While the State's plans and specifications are referenced within the subcontracts in question, there is no language clearly expressing an intent for the subcontractors to assume a direct duty to the

State. The provisions referenced by the State do not include a "promise or the specific intention to benefit" the State, nor were the provisions "made directly and primarily for the [State's] benefit." *Holiday Development Co. v. Tobin Construction Co.*, 219 Kan. 701, 708, 549 P.2d 1376 (1976) (quoting *Mortgage Associates v. Monona Shores*, 47 Wis. 2d 171, 190-91, 177 N.W.2d 340 [1970]). Therefore, we hold that under the language of the subcontracts in question, the State was not an intended beneficiary and the district court's order dismissing the State's claims against PMC, DEN, and ATP is affirmed. Our decision renders unnecessary any discussion and analysis as to the nature of the State's damage claims against these companies with whom there is no privity.

Affirmed in part, reversed in part, and remanded with directions.█

DAVIS, J., not participating.

DAVID S. KNUDSON, J., assigned.[2]

---

[2] Judge Knudson, prior to his retirement as a judge on the Kansas Court of Appeals, was appointed to hear case No. 87,393 vice Justice Davis pursuant to the authority vested in the Supreme Court by K.S.A. 20-3002(c); at the time of the filing of this modified opinion, Judge Knudson had retired and been appointed as a Senior Judge assigned to the Kansas Supreme Court.