NOT DESIGNATED FOR PUBLICATION

No. 113,851

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LONNIE CLINE and JOE CLINE,
*Appellees*,

v.

GARY PETERSON,
*Appellant.*


MEMORANDUM OPINION


Appeal from Ness District Court; BRUCE T. GATTERMAN, judge. Opinion filed October 7, 2016. Reversed.

*John Hicks* and *Samuel Bennett*, of Norris & Keplinger, L.L.C., of Overland Park, for appellant.

*Robert R. Eisenhauer* and *Daniel O. Lynch*, of Johnston, Eisenhauer, Eisenhauer & Lynch, LLC, of Pratt, for appellees.

Before LEBEN, P.J., PIERRON and MCANANY, JJ.


LEBEN, J.: In 1996, Jim Cline sold 600 acres of farmland in Ness County to Gary Peterson, reserving the right to continue living on the land for the rest of his life. In 2006, Peterson sent Jim a letter confirming the terms of an agreement they had reached on the phone: they agreed to split the mineral rights to the 600 acres and agreed that the homestead and the 250 acres around it belonged to Jim. The letter also provided that Jim could leave his mineral rights to his children.

Jim died in 2010, and in 2012, Peterson obtained some oil-and-gas leases on the property. Jim's children, Joe and Lonnie Cline, filed a lawsuit in 2013, claiming that Peterson was required to give them (1) half of any proceeds from the mineral rights and (2) the homestead and the 250 acres around it. A jury in Ness County agreed, but Peterson has appealed.

Peterson claims that Joe and Lonnie can't bring a suit claiming benefits under the contract since they weren't parties to it. While a third party can sometimes bring claims under a contract—as a third-party "beneficiary" of the contract—Kansas law requires that the contract *clearly express* the intent to benefit a third party. Peterson argues that there's nothing in the 2006 letter indicating that intent.

We agree: The letter provides that Jim "may" leave his mineral rights to his children, but it doesn't require him to do so. And nothing in the letter purports to give Joe and Lonnie any rights to the homestead or the acreage around it. So Joe and Lonnie lack standing, or legal ability, to bring this lawsuit, and the district court should have dismissed their claims. We therefore reverse the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Peterson tells the beginning of the story like this. He and Jim were old friends. Since at least the early 1980s, they had hunted pheasants together about once a year on and around Jim's property—600 acres of farmland in Ness County.

During the 1980s, Jim's wife got sick, and Jim had trouble paying the medical bills while maintaining his cattle business. To help out, Peterson offered to buy some cattle,

2

which Jim would raise, and the two would split the proceeds evenly; this casual business arrangement continued until 2008.

In the 1990s, Jim's wife got sick again, and again Jim had a hard time paying the medical bills. So in 1996, Jim sold his 600 acres of farmland to Peterson for $120,000 ($96,000 for 480 acres with an option, that Peterson exercised, to buy the remaining 120 acres for $24,000); Peterson paid some of that to Jim, but he paid a lot of it directly to various medical providers.

In 2000, Jim formally transferred the 600 acres to Peterson by warranty deed. The warranty deed said that the land was a gift from Jim to Peterson, but no one disputes that Peterson actually paid for the land, as required by the 1996 contract. Both the deed and the 1996 contract reserved a life estate in the property for Jim, so he had the right to live on and use the property until his death.

Jim paid the property taxes on the 600 acres until he died, even though the 1996 contract provided that Peterson would start paying taxes after he bought the land. Jim died in November 2010; the plaintiffs in this case are two of Jim's children, Joe and Lonnie Cline. (A third son, Rex, is dead.)

The dispute in this case centers around a letter that Peterson wrote, signed, and sent to Jim in May 2006, putting to paper a conversation that they'd had on the phone related to the 600 acres. The letter deals primarily with two issues: (1) mineral rights; and (2) the homestead and the 250 acres surrounding it:

> "Per our phone conversation we have agreed to the following split on the Mineral Rights for the land that I purchased from you. We will split all Mineral Rights on a 50% 50% basis as of now. We also agreed that all proceeds up to the first $2,000.00 each month would be exclusively yours, anything over is split 50/50 on the additional money

only. Upon your death you may leave any Mineral Rights to your children, but the first $2,000.00 will be split equally from dollar one. The 250 acres around the homestead is in fact all yours and all rights are yours to [do] with as you see fit. If I choose to invest in the drilling of the property all working interest received will be 100% mine since I am the one that is putting the money down up front.

"I have also attached a check for the meat and the $1,500.00 to repair the truck.

"I hope this is all ok and is what we discussed on the phone. If not please let me know."

According to Peterson, the agreement about mineral rights was contingent on Jim doing the work to obtain an oil-and-gas lease during his lifetime; because Jim didn't get a lease, Peterson says this letter can't be enforced against him. Neither the deed nor the 1996 contract included any terms about mineral rights, and Peterson testified that since he owned the land but Jim had a life estate, neither of them had known who owned the mineral rights before they came to this 2006 agreement.

Regarding the homestead, Peterson testified that he had believed, for reasons he couldn't explain, that Jim had originally owned 850 acres of land and had mistakenly conveyed all 850 acres to him, rather than only the 600 acres that Peterson paid for—this was Peterson's explanation for why the letter says that the homestead and the 250 acres around it belong to Jim. Peterson said that he had discovered that the homestead and the land around it were part of the 600 acres he owned when he obtained some oil-and-gas leases in August 2012, for which he received around $93,000.

Joe and Lonnie—Jim's children and the plaintiffs in this case—interpret the letter as a contract that they can enforce against Peterson. They testified that their dad had never owned or pretended to own more than 600 acres and that they didn't know any details firsthand about the original sale of the 600 acres to Peterson or about the phone

4

call that preceded the 2006 letter. Joe testified that he had found out about the letter sometime in 2006. Joe's wife Vicki also testified that Jim had shown the letter to her and Joe that year. Joe said that he believed the letter meant that after his dad died, Peterson would convey the homestead and 250 acres back to him and his siblings. Joe testified that when he had discussed the letter with his dad in 2006, his dad had said that Peterson "would take care of" him and his siblings and that Peterson "would do what's right." Lonnie didn't see the letter until after his dad's death. But Lonnie was going to be the executor of Jim's estate, and Lonnie said that when he had discussed this topic with his dad in 2010, his dad had said, "I have everything taken care of. Mr. Peterson will take care of you boys after I have gone with all the land dealings."

Joe testified that it was easy to identify the homestead and land around it because a road ran through the 600 acres, and the homestead and 250 acres around it were all south of that road. Under cross-examination, Joe said that only 240 acres surrounded the homestead. Lonnie likewise testified that the homestead was on about 240 or 250 acres of land south of the road and that the rest of the property was north of the road. Joe admitted that while the deed and the 1996 contract accurately described the four tracts of land comprising the 600 acres, no single tract or any combination of the four tracts added up to 250 acres. For his part, Peterson testified that he knew where the homestead was located well enough that he could drive there.

Lonnie testified that he had called Peterson after Jim's death, had offered to pay the property taxes for 2010, and had suggested that they get together to discuss transferring the homestead and the 250 acres back to him and his siblings. Lonnie said that Peterson had responded by saying that he needed to get the land surveyed in order to transfer it. Lonnie also said that at some point he had offered to buy the rest of the land from Peterson, but Peterson didn't accept.

Vicki testified that she had also corresponded with Peterson about getting the homestead back. In late 2010, 6 days before Jim died, Peterson replied to an email from Vicki and wrote: "[Jim] still owns the homestead [and] the 200 acres around the house also." In May 2012, Peterson wrote to Vicki that he'd been having a hard time finding someone to survey the land, saying: "If someone can help me get the land separated I will sign it over to you." Again, Peterson said that he had believed Jim had mistakenly conveyed 850 acres instead of 600 acres, which was why he had said that Jim still owned the homestead and that he would convey the homestead back to Jim's children.

After Peterson stopped answering their calls, Joe and Lonnie filed this lawsuit in May 2013. Peterson filed a motion to dismiss, arguing in part that Joe and Lonnie lacked standing to enforce the 2006 letter. The district court denied this motion. Eventually the case was tried to a jury.

After a 2-day trial, the jury found that the 2006 letter was an enforceable contract, requiring Peterson (1) to convey "the 250 acres, more or less," to the plaintiffs, (2) to convey half of the mineral rights in the 600 acres to the plaintiffs, and (3) to pay the plaintiffs $46,500 (half of what he's already received for the oil-and-gas leases). The district court denied Peterson's posttrial motions for a judgment as a matter of law (an order by the judge rather than a jury verdict).

Peterson then appealed to our court.

ANALYSIS

Although Peterson raises several issues on appeal, the threshold issue is whether Joe and Lonnie have legal standing to sue for the benefits of the contract. Peterson argues they don't because they weren't parties to the letter (which *is* the claimed contract) and are not intended third-party beneficiaries of it. "Standing" means that a plaintiff has a

6

personal stake in the outcome of a controversy such that he or she can bring a lawsuit; standing affects a court's ability to hear the case, and this court reviews the issue without deference to the district court's conclusion. *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 750-51, 189 P.3d 494 (2008).

Generally, only the parties to a contract—the people who agreed to its terms—have standing to enforce that contract in court. See *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 793, 107 P.3d 1219 (2005). Joe and Lonnie weren't parties to the 2006 letter; only Peterson and Jim were. But Joe and Lonnie argue that they have standing anyway because they are the intended third-party beneficiaries of the 2006 letter. Third-party beneficiaries (people who benefit from a contract even though they aren't parties to that contract) can be either intended or incidental, and only intended beneficiaries have standing to enforce a contract. *Stovall*, 278 Kan. at 795 (quoting Restatement [Second] of Contracts § 302 [1981]); *Fasse v. Lower Heating & Air Conditioning, Inc.*, 241 Kan. 387, 389, 736 P.2d 930 (1987); *Byers v. Snyder*, 44 Kan. App. 2d 380, 386-87, 237 P.3d 1258 (2010).

A person is an intended third-party beneficiary if the contracting parties intended to benefit that person and that intent is clearly expressed in the contract. *Stovall*, 278 Kan. at 793-94 (quoting *Fasse*, 241 Kan. at 389); *Martin v. Edwards*, 219 Kan. 466, 473, 548 P.2d 779 (1976) ("Contracting parties are presumed to act for themselves and therefore an intent to benefit a third person must be clearly expressed in the contract."). Simply knowing that a third party will or could benefit from the contract is not enough: "'Knowledge that a contract will benefit a third party is not *intent* to benefit the third party.'" (Emphasis added.) *Stovall*, 278 Kan. at 795 (quoting *Noller v. General Motors Corp.*, 244 Kan. 612, 617, 772 P.2d 271 [1989]). The burden of establishing standing to enforce a contract as an intended third-party beneficiary rests with the party asserting it—here, Joe and Lonnie. See *Stovall*, 278 Kan. at 793; *Kincaid v. Dess*, 48 Kan. App. 2d 640, 647, 298 P.3d 358, *rev. denied* 297 Kan. 1246 (2013).

7

Joe and Lonnie first argue that a different standard applies for determining intent to benefit a third party. In support, they cite the case of *Hawkinson v. Bennett*, 265 Kan. 564, 594, 962 P.2d 445 (1998), where our Supreme Court said that the intent to benefit a third party doesn't have to appear expressly in the contract; instead, the court can infer the intent to benefit from the terms of the agreement or from the surrounding circumstances. However, as Peterson pointed out in his reply brief, the standard cited in *Hawkinson* comes from a Colorado case—in *Hawkinson*, the contract being interpreted was a franchise agreement entered into with a company located in Denver, and the trial court had applied Colorado law to the contract dispute. 265 Kan. at 594 (quoting *Parrish Chiropractic v. Progressive Cas.*, 874 P.2d 1049, 1056 [Colo. 1994]). So while Colorado law may not require the intent to benefit a third party to be clearly expressed in the contract, Kansas law clearly does. See *Stovall*, 278 Kan. at 793-94; *Byers*, 44 Kan. App. 2d at 387 (noting the different standard in *Hawkinson*). Because of this, Joe and Lonnie must show that some provision in the contract operates to their personal benefit.

To determine whether Jim and Peterson intended for the 2006 letter to benefit Joe and Lonnie, we apply the normal rules of contract interpretation and are not bound by the district court's interpretation of the contract. *Cornwell v. Jespersen*, 238 Kan. 110, 116, 708 P.2d 515 (1985); *Kincaid*, 48 Kan. App. 2d at 647. Generally, a court determines the contracting parties' intent from the language of the contract. *Byers*, 44 Kan. App. 2d at 386.

The 2006 letter does *mention* Joe and Lonnie when it provides that Jim has the option of leaving his mineral rights to his children when he dies: "Upon your death you *may* leave any Mineral Rights *to your children*, but the first $2,000.00 will be split equally from dollar one." (Emphasis added.) But this provision does nothing more than give Jim the option of leaving his mineral rights to his children; it doesn't require him to do so. Furthermore, no provision in the 2006 letter requires *Peterson* to convey anything

8

to Jim's children. At most, Peterson knew that Joe and Lonnie *might* benefit from the 2006 letter, but knowing that isn't the same as intending it. See *Stovall*, 278 Kan. at 795 (quoting *Noller*, 244 Kan. at 617). Simply put, nothing in the 2006 letter provides that Peterson and Jim intended to benefit Jim's children.

Joe and Lonnie argue that the 2006 letter demonstrates Jim and Peterson's agreement as to how the property would be owned following Jim's death, but that reading just isn't supported by the language. The letter provides how Jim and Peterson will split the mineral rights and states that the homestead and the 250 acres around it still belonged to Jim, who retained all rights on that land "to do with as you see fit." Although it mentions what might happen after Jim's death, it primarily deals with the current state of the property. Joe and Lonnie presented evidence at trial that Jim had told them that Peterson would take care of them after he died, which suggests that Jim, at least, intended for the 2006 letter to benefit his children; however, that intent is not expressed in the letter's plain language. As Joe and Lonnie admit, "there is no express provision in the letter requiring [Peterson] to convey the property" to them, whether that property is mineral rights or the homestead. Nonetheless, Joe and Lonnie insist that the purpose of the 2006 letter was to ensure that when Jim died, his children would get his 50% mineral interest and the homestead. But the plain language of the letter simply cannot support that reading, given the requirement of Kansas law that the intent to benefit a third party be clearly expressed in the contract.

Because nothing in the 2006 letter suggests that Peterson and Jim intended to benefit Jim's children, Joe and Lonnie are not intended third-party beneficiaries and do not have standing to enforce the 2006 letter. The district court should have dismissed their claims.

We therefore reverse the district court's judgment.

9